**Bobby L. HINDS, Plaintiff-Appellant,**

v.

**PLANTATION PIPE LINE COMPANY, et al., Defendants-Appellees.**

No. 71–2427.

United States Court of Appeals, Fifth Circuit.

Feb. 22, 1972.

Bell, Circuit Judge, filed a dissenting opinion.

Frank O. Burge, Jr., Birmingham, Ala., for plaintiff-appellant.

Thomas R. Elliott, Jr., Birmingham, Ala., for defendants-appellees.

Before BELL, AINSWORTH and GODBOLD, Circuit Judges.

AINSWORTH, Circuit Judge:

This is an Alabama diversity action for damages for an alleged breach of an oral agreement by defendants. Suit was originally filed in state court and later removed to the federal district court. At the close of plaintiff's evidence the trial judge directed a verdict in favor of defendants, from which plaintiff appeals.[1] We reverse and remand.

Bobby L. Hinds, appellant, was the owner of real property in Shelby County, Alabama, adjacent to property of his mother, Maggie W. Hinds, which he had leased from her and on which he operated a dairy farm. Defendant Plantation Pipe Line Company owned a right-of-way on which it had constructed a pipeline across the properties of plaintiff and his mother. In 1968 Plantation desired to purchase additional right-of-way next to the existing right-of-way for the purpose of installing another pipeline. Defendant Ford, Bacon and Davis Construction Corporation had contracted with Plantation to build the proposed pipeline.

During the early part of 1968, an agent of defendants approached plaintiff to obtain the additional easement and right-of-way. Plaintiff held a written power of attorney for his mother, who was virtually blind. On August 1, 1968, after preliminary negotiations had occurred, agreements were entered into between plaintiff and representatives of defendants whereby plaintiff was paid the sum of $10,000, and his mother was paid the sum of $15,000, for the right-of-way grants on the properties owned respectively by plaintiff and his mother and for "damages of every kind and character which the undersigned, their successors, heirs, personal representatives and assigns now have or may have in the future against the said Company arising out of the construction of a pipeline"[2] across the lands involved. Simultaneously, plaintiff executed the right-of-way grants in favor of Plantation Pipe Line Company. Plaintiff and his wife signed one release affecting plaintiff's property. Plaintiff and his mother jointly signed a similar release affecting the mother's property, a duplicate copy of which was signed by plaintiff alone. However, prior to the execution of these instruments, plaintiff, upon noticing the release in connection with his mother's property on which he held a lease, initially declined to sign inasmuch as he had a growing corn crop on the field which he intended to harvest and use as silage for his dairy herd. He told defendants' representatives that it was important for him to harvest the crop before they

1. The opinion of the district court in connection with directing the verdict at that time, reads as follows:

"It is the Court's opinion that there has been no legal justification for setting aside the release, and that, therefore, the release is a bar to recovery in the case, and the defendant's motion for a directed verdict will be granted."

2. The release in question provides in pertinent part as follows:

"In Consideration of the sum of Twelve Thousand & no/100 Dollars paid by Plantation Pipe Line Company, a Delaware and Virginia corporation, the receipt of which is hereby acknowledged, the undersigned hereby release(s) and forever discharge(s) Plantation Pipe Line Company, its successors and assigns, from all claims and demands for damages of every kind and character which the undersigned, their successors, heirs, personal representatives and assigns now have or may have in the future against the said Company arising out of the construction of a pipeline across the following described land in Shelby County, Alabama: [A description of the mother's property follows] and this shall be deemed to be and is a complete discharge and satisfaction of the obligation of said Company to pay damages which may be occasioned by the construction of said line, and of the promise to pay such damages contained in the right of way easement grant and amendment this day executed by the undersigned to said Company, said right of way easement grant and amendment and this release being executed simultaneously."

went onto the property. Oral representations were made to plaintiff which, according to plaintiff's testimony and his contentions on this appeal, assured plaintiff that defendants would allow him to remove his corn crop, that defendants had not been in the field, that they desired to go into it about September 1, but that they would notify him if they did go in prior to that date.[3] Following this alleged oral understanding, which is the agreement plaintiff contends was breached, defendants prepared and signed a letter addressed to plaintiff in the following language:

"This will confirm our agreement of this date that during the construction of a 30-inch pipeline across the lands of Mrs. Maggie Hinds, on which you are the Tenant, none of the corn will be damaged prior to September 1, 1968.

"However, should it become necessary for equipment to enter this corn field prior to that time and clear the right of way of corn, Plantation Pipe Line Company will pay the sum of $1,-000 providing that the corn is cleared from the right of way and temporary work space entirely across the field."

Plaintiff then executed the agreements and releases. The letter and the agreement and release affecting the mother's property, all of which are dated August 1, 1968, are the instruments involved in this action, and the question before us is whether the alleged oral agreement can have validity in the face of these instruments.

It is plaintiff's position that the oral agreement of defendants not to enter his corn field prior to informing him was separate and apart from the matters covered by the release and the letter, and that it was breached to his detriment. He testified that on August 10, 1968 he began harvesting his corn crop. When he arrived at the field he noticed that an opening in a fence surrounding the property had been cut at the point where the right-of-way crossed the fence and that tassels of corn along the right-of-way had been recently cut off. Wooden stobs and stakes had been driven into the field outlining the right-of-way, which knocked off metal cleats or slats from the conveying chain of his harvesting machine. These pieces of metal were ground up with the corn silage. Thus, he asserts, the silage containing the

---

3. Plaintiff testified in pertinent part as follows:
(App. 76) "Q. At the time those papers were produced, had you all already agreed on the ten thousand and the fifteen thousand or not? A. Yes, sir.
"Q. You had? A. Yes, sir.
"Q. Had there been anything said about a release, or about damages by anybody prior to those papers being produced? A. No, sir.
"Q. And what was said when the papers were produced?
A. Well, when they handed me these papers, I saw this releasement.
"Q. Releasement? A. Yes, sir.
"Q. O. K. A. And asked him to explain that to me, and he did explain it.
* * * *
(App. 77) "Q. Ultimately that evening those papers were signed; is that correct? A. Yes, sir.
"Q. At what stage did you say something about the corn crop? A. Yes, sir.

"Q. When was that, before or after those papers were signed? A. Before the papers were signed.
"Q. What brought that subject up? A. I had a field planted in corn on my mother's property.
"Q. At what stage did you tell them about that insofar as the signing of these papers was concerned? You said you saw one of them was a releasement. Was it at that time or later you told them about this corn crop you wanted to get in? A. It was at that time.
"Q. At what time? A. When he got these papers out, I told him I couldn't sign them, I would have to get my corn crop off.
"Q. And what did he say? A. He said, well, they would tend to that. He said they would let me get my corn crop off. He said they hadn't been in my field and wouldn't go in there, and I could go ahead and get my corn in or they would notify me.
"Q. Or they would what? A. Or they would notify me if they had to go in before September 1st on this construction."

metal was then fed to his cattle causing illness to the herd and resulting in a large sum of damages to plaintiff due to loss in milk production during the next two years.

Plaintiff contends that the sum of $12,-000 contained in the release, which plus the sum of $300 for the right-of-way grant was paid to his mother,[4] was not intended to cover damages to him; that the total sum of $15,000 was the amount agreed upon for the right-of-way across his mother's property prior to the verbal discussion between him and defendants relative to the removal of his corn crop; that the oral agreement was used as an inducement for plaintiff's execution of the release, and that the breach of said oral agreement constituted legal fraud as the representations made were material, false and relied on by plaintiff to his detriment.

Defendants rely on the release and contend that parol evidence could not vary the written agreement between the parties, especially the release. They further contend that any oral understanding about entering the corn crop was merged into the written letter and that under Alabama law the district judge acted properly in directing a verdict in favor of defendants. Defendants further contend that there is no evidence in the record that they went into plaintiff's corn field, and assuming arguendo

that they did, such an action would not constitute a breach of their agreement unless they did so without notifying plaintiffs, and such a breach, which they deny, could not have been the proximate cause of plaintiff's damages.

 Alabama adheres to the general rule of contract law, as stated by the Alabama Supreme Court on many occasions, that "when the parties reduce their agreements to writing, the writing —*in the absence of* mistake or *fraud* or ambiguity—is the sole expositor of the transaction and the intention of the parties. Joseph v. Hopkins, 276 Ala. 18, 158 So.2d 660 (1963)," Collier v. Brown, 285 Ala. 40, 228 So.2d 800, 803 (1969). (Emphasis supplied.) See also Chastain & Blass Real Estate & Ins., Inc. v. Davis, 280 Ala. 489, 195 So.2d 782, 784 (1967); Percoff v. Solomon, 259 Ala. 482, 67 So. 2d 31, 41 (1953). Thus fraud is clearly an exception to the parol evidence rule, and under Alabama law misrepresentations of material facts, though innocently made, constitute legal fraud.[5] Title 7, § 108, Code of Alabama 1940. Whether or not the alleged misrepresentations were made is a factual matter to be determined by a jury.

 Alabama acknowledges a further exception to the parol evidence or merger rule where the oral agreement is separate or distinct from that contained in the written agreement. In

---

4. Defendant Plantation Pipe Line Company issued two sight drafts to the owners of the respective properties. The draft on the property involved in this suit in the sum of $15,000 is made payable to Maggie W. Hinds, $3,000 of which is for the right-of-way grant, and $12,000 for damages.

The other draft, made payable to plaintiff and his wife in the sum of $10,-000, is in connection with plaintiff's property which is not involved in this appeal.

5. Defendants contend that inasmuch as plaintiff failed to tender the $12,000 consideration for the release with reasonable promptness upon his discovery of the alleged fraud, he was not entitled to a rescission of the release. It is plaintiff's position that he received no consideration

for the release in question, that the sum recited therein was paid to his mother, not to him. While the law of Alabama is clear that as a condition precedent to avoiding a release for fraud, a party is bound to return any valuable consideration therefor within a reasonable time after the discovery of the alleged fraud, Birmingham Ry., Light & Power Co. v. Jordan, 170 Ala. 530, 54 So. 280 (1911); Ledbetter v. Frosty Morn Meats, 274 Ala. 491, 150 So. 2d 365 (1963), the corollary is equally clear that where the consideration is without value, or there is no consideration given for the release, there is nothing required to be returned. See Standard Tilton Milling Co. v. Mixon, 243 Ala. 309, 9 So.2d 911 (1942) and cases cited therein.

Hartford Fire Insurance Company v. Shapiro, 270 Ala. 149, 117 So.2d 348, 353 (1960), the Alabama Supreme Court recognized this exception contingent upon the existence of the three following conditions: the agreement must in form be a collateral one; it must not contradict express or implied provisions of the written contract; and it must be one that parties ordinarily would not be expected to embody in the written instrument. In discussing *Hartford*, the Court of Civil Appeals of Alabama, in Southern Guaranty Insurance Company v. Rhodes, 46 Ala.App. 454, 243 So.2d 717 (1971), said:

> "That there is a so-called exception to the parol evidence rule is recognized in this state. We admit the use of the term 'so-called' is of our own origin. The exception as expressed by our Supreme Court in the Hartford Fire Insurance case is positive. The exception there stated appears to be that if there is an oral agreement, collateral, separate and distinct from the written agreement, the parol evidence rule does not apply." 243 So.2d at 720.

The Court in *Rhodes* was of the opinion that the "stated rule" announced in *Hartford* should not be categorized as "being an exception to or involved with the parol evidence rule," 243 So.2d at 720, that instead, where the oral agreement is shown to be collateral, separate and distinct, it should be admissible as a separate contract. In this respect it said:

> "The principle of the parol evidence rule is that if parties negotiate, either by parol or memoranda, the details of a contract, and integrate such negotiations into a single instrument, all other indicia of the negotiations on the subject are legally immaterial for the purpose of determining what are the terms of their act. This principle does not prohibit negotiation of more than one agreement at the same time, nor that one agreement may be reduced to writing and another be oral. If such agreements are clearly collateral, separate and distinct as to subject matter there is no problem presented. They are two separate contracts and are to be considered as such. The oral contract is admissible and enforceable, not as an exception to the parol evidence rule, but as a separate jural act. However, if from a consideration of the negotiations, acts, statements and surrounding cirmumstances, it appears that it was the intent of the parties that the ultimate written instrument would embody the whole of the transaction, and fully cover the subject of negotiation, there can be no collateral or separate oral agreement on the same subject.

> "Therefore, we must determine from the conduct and language of the parties, the surrounding circumstances and the written instrument, whether it was the intent of the parties that the written instrument embody all of the prior negotiations and represent the final jural act, or whether it represented only a part thereof and it was intended there be an additional, collateral and separate oral agreement." 243 So.2d at 721.

█ █ We are not persuaded by defendants' contentions that the oral representations made by them were merged in the letter or the release.[6] The oral representations of defendants, according to plaintiff, were that they had not been in

---

6. Determination of the threshold issue of whether the written instruments were such an integration of the negotiations and agreements between defendants and plaintiff as to exclude parol evidence of an alleged oral agreement was for the trial court in the first instance. Southern Guaranty Ins. Co. v. Rhodes, 1971, 46 Ala. App. 454, 243 So.2d 717; Hartford Fire Ins. Co. v. Shapiro, 1960, 270 Ala. 149, 117 So.2d 348; Wigmore on Evidence, 3rd Ed., § 2430. But its conclusion, which may rest upon underlying factual questions, is subject to appellate review. *Southern Guaranty*, supra; *Hartford*, supra. See also Carolina Metal Products Corp. v. Larson, 5 Cir., 1968, 389 F. 2d 490, and 3 Corbin on Contracts, § 595.

plaintiff's corn field prior to August 1, 1968, they would not enter it prior to September 1, but in the event they found it necessary to do so before that date they would notify plaintiff. An examination of the letter agreement signed by defendants, which they contend merged the prior representations, shows that none of the oral statements are contained in the letter. In our view, there is no contradiction between the oral and written words. If in fact there was such a verbal understanding—and this is a question for jury determination—it was collateral, separate and distinct from the written letter. Whether it is classified as coming within the exception to the parol evidence rule, Hartford Fire Insurance Company v. Shapiro, *supra*, or as a separate agreement and as such separately enforceable, Southern Guaranty Insurance Company v. Rhodes, *supra*, the result is the same. Nor can we agree that the verbal statements, if made, were merged into the release. The record shows the following sequence of events. The release for the stated consideration of $12,000, prepared by defendants, was submitted to plaintiff, whereupon he declined to sign it. It contained no consideration flowing to him for his valuable interest in the growing corn crop. He wanted an additional assurance that he would be able to harvest the corn. He used his corn crop as fodder in his milk dairy farm operation. It was at this point in time that the parties entered into a verbal discussion out of which ensued the oral promises testified to by plaintiff and on which he relied. The release was not amended to incorporate these provisions, thus the conclusion is unwarranted that the written instrument merged the oral representations of defendants.

■ Under the circumstances, the granting of a directed verdict was improper. The questions of whether defendants made an oral agreement containing the representations alleged by plaintiff; if so, whether they breached that agreement; whether such a breach was the proximate cause of damage to plaintiff's herd resulting in decreased milk production and, if so, the amount of damages involved, were and are matters to be resolved by the jury under the standards outlined in our en banc decision of Boeing Company v. Shipman, 5 Cir., 1969, 411 F.2d 365.[7]

Reversed and remanded.

BELL, Circuit Judge (dissenting):

I respectfullly dissent. At bottom, the court is permitting a jury to consider a claim for damages that was clearly embraced in a release. This is done on the basis of testimony of plaintiff, the import of which seems to me to be misapprehended. Using this testimony as a premise, the court then converts it into a cause of action on the theory that it described a separate agreement, and also a misrepresentation amounting to legal fraud.

It must be remembered that the release covered all past and future damages but plaintiff wished to save and remove his corn crop. The testimony in question (footnote 3 of the majority opinion),

7. "On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence —not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. . . . There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." 411 F.2d at 374, 375.

points definitely to this wish on the part of plaintiff and to nothing else:

(App. 76) "Q. At the time those papers were produced, had you all already agreed on the ten thousand and the fifteen thousand or not? A. Yes, sir.

"Q. You had? A. Yes, sir.

"Q. Had there been anything said about a release, or about damages by anybody prior to those papers being produced? A. No, sir.

"Q. And what was said when the papers were produced? A. Well, when they handed me these papers, I saw this releasement.

"Q. Releasement? A. Yes, sir.

"Q. O. K. A. And asked him to explain that to me, and he did explain it.

\* \* \* \*

(App. 77) "Q. Ultimately that evening those papers were signed; is that correct? A. Yes, sir.

"Q. At what stage did you say something about the corn crop? A. Yes, sir.

"Q. When was that, before or after those papers were signed? A. Before the papers were signed.

"Q. What brought that subject up? A. I had a field planted in corn on my mother's property.

"Q. At what stage did you tell them about that insofar as the signing of these papers was concerned? You said you saw one of them was a releasement. Was it at that time or later you told them about this corn crop you wanted to get in? A. It was at that time.

"Q. At what time? A. When he got these papers out, I told him I couldn't sign them, I would have to get my corn crop off.

"Q. And what did he say? A. He said, well, they would tend to that. *He said they would let me get my corn crop off. He said they hadn't been in my field and wouldn't go in there, and I could go ahead and get my corn in or they would notify me.* (Emphasis added)

"Q. Or they would what? A. Or they would notify me if they had to go in before September 1st on this construction."

At another place in the record (App. 33, 34), plaintiff related the conversation regarding the corn crop and said that he was promised that he would be notified before Plantation went into the field. Again, this testimony pertained only to removing the corn crop. Plantation did not disturb the corn crop and no claim is made for the corn.

At this point, the letter agreement concerning the removal of the corn crop was executed. This was the only variance of the release. As I understand the matter, the majority does not contend otherwise. Rather, the premise is that a separate agreement existed by virtue of the testimony that ". . . He said they hadn't been in my field and wouldn't go in there, . . . .", supra.

The testimony that Plantation would not go into the field, in my view, is tied to giving notice to plaintiff so that he could remove his corn. This is reinforced by the letter received at the time to allow the removal of the corn or to pay damages for it.

The damages now claimed are of the type which were covered in the release:

". . . this shall be deemed to be and is a complete discharge and satisfaction of the obligation of said Company to pay damages which may be occasioned by the construction of said line, and of the promise to pay such damages contained in the right of way easement grant and amendment this day executed . . ." App. 173

This quoted language ties to the right of way grant which contained the following provision:

". . . Grantee shall pay for all damages to crops, fences and timber that may be suffered by Grantor(s) by reason of the exercise by Grantee of any of the rights and privileges hereby granted, but after the first of

said pipe lines has been laid Grantee shall not be liable for damages caused by keeping said right of way clear of trees, undergrowth and other obstructions in the course of the maintenance and operation of its pipe line system and appurtenances." App. 178

The oral representation now asserted is not such a separate agreement under the cases cited by the majority as to avoid the parol evidence rule. Certainly, taken in context, it cannot amount to a misrepresentation of material facts tantamount to fraud under Alabama decisions.

I think that the district court properly directed a verdict for Plantation.