**Private Donald SILVERTHORNE, Jr.,**
**Petitioner-Appellant,**

v.

**Melvin LAIRD, Secretary of Defense,**
**et al., Respondents-Appellees.**

**No. 71-3536.**

United States Court of Appeals,
Fifth Circuit.

April 14, 1972.

Rehearing and Rehearing En Banc
May 22, 1972.

---

Maury Maverick, Jr., San Antonio, Tex., Ernest Altgelt, III, New York City, for petitioner-appellant.

William S. Sessions, U. S. Atty., Henry Valdespino, Asst. U. S. Atty., San Antonio, Tex., for respondents-appellees.

Before RIVES, COLEMAN and DYER, Circuit Judges.

RIVES, Circuit Judge:

On May 24, 1971, the Conscientious Objector Review Board of the United States Army (CORB) denied appellant Silverthorne's application for discharge from the Army, sought pursuant to Army Regulation 635–20, as a 1–O conscientious objector. Thereafter, Silverthorne sought habeas corpus relief in the United States District Court for the Western District of Texas. In his petition to that court, Silverthorne advanced two alternative theories upon which he claimed a right to be discharged. First, he argued that there was no basis in fact for denying his application. Second, Silverthorne alleged that the Army should have discharged him pursuant to Army Regulation 635–212 (unsuitable or unfit for further military duty). As to both claims the court denied relief, finding that there was a basis in fact for de-

nying him a 1–O classification and that the court was without jurisdiction to consider the second claim. On November 9, 1971, Silverthorne filed his notice of appeal. On March 14, 1972, two days prior to oral argument of Silverthorne's cause to this Court, the district judge ·issued a written opinion, 341 F.Supp. 443, in which he thoroughly discussed the rationale in support of his earlier order denying habeas corpus relief. We are in accord with his judgment and affirm.

 Silverthorne has moved that this Court refuse to consider the district court's March 14 opinion. His contention is that the filing of an opinion subsequent to the institution of this appeal violates the rubric that an appeal "divests the district court of authority to proceed further with respect to [the case], except in aid of the appeal * * *." 9 Moore's Federal Practice ¶ 203.11 (footnote omitted). We do not agree that the district judge offended the above-stated principle. His written opinion in no way contradicts his earlier order denying habeas corpus relief. Indeed his amplified views are of great aid in this appeal. We are thus able to examine the case with a thorough understanding of the lower court's posture.

In short, we subscribe to the following analysis of the rule against district court activity subsequent to the taking of an appeal:

"In general, the district court should have full authority to take any steps during the pendency of the appeal that will assist the court of appeals in the determination of the appeal. Restrictions on the power of the district court that are grounded in nothing more than the technical consideration that jurisdiction 'passes' from it upon the filing of the notice of appeal are impractical and unwise. Dictum in Philadelphia Marine Trade Ass'n v. International Longshoremen's Ass'n (CA3d, 1966) 365 F2d 295, rev'd on other grounds (1967) 389 US 64, 88 S Ct 201, 19 L ed2d 236, to the effect that the filing of a notice of appeal

on the day judgment was entered and before the trial court had entered findings of fact and conclusions of law precluded the court from entering such findings is an example of a technical application of the general rule which serves no useful purpose."

9 Moore's Federal Practice ¶ 203.11 n. 2. As such we conclude that the lower court had the necessary jurisdictional power to issue its March 14 opinion. Ordinarily, of course, a district court should not file its opinion in such close proximity to oral argument of the case on appeal. Thus, in order to avoid any suggestion of unfairness or prejudice, we have afforded both parties to this case ample time in which to file additional briefs discussing the lower court opinion. Having received those briefs we now proceed to the merits of the appeal.

## I. Conscientious Objector Claim

### A. The Law

■ ■ To qualify for discharge from the Armed Services as a conscientious objector, the applicant must meet the same test as one seeking draft classification as a conscientious objector; that is, he must show:

(1) That he is opposed to war in any form, Gillette v. United States, 1971, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 168;

(2) that his objection is grounded in religious principles as construed in Welsh v. United States, 1970, 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308, and United States v. Seeger, 1965, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733; and

(3) that his convictions are sincere, Witmer v. United States, 1955, 348 U. S. 375, 75 S.Ct. 392, 99 L.Ed. 428.

Once the applicant has made a prima facie showing that he has satisfied this tripartite test, it becomes the Army's burden to refute the claim.

AR 635–20 sets out the procedure for processing an application for discharge as a conscientious objector. According thereto, the applicant is to be given an interview, if he so desires. Thereafter the applicant's commanding officers are asked to review the case and recommend a disposition to the CORB. Together with those recommendations, the CORB considers "any other remarks that may be pertinent. Where applicable official records in the applicant's Military Personnel Record Jacket [201 file] will be cited or attached to the file as inclosure." AR 635–20 ¶ 4b(5). Also the commanding officers are to state their reasons for the recommendations which they tender. AR 635–20 ¶ 4b(4) (b)1.

■ Where the CORB rejects the applicant's request for a 1–O classification (conscientious objector discharge), its decision is subject to review in federal court by way of habeas corpus proceedings. The scope of such review is severely limited. The CORB judgment must be sustained if the court can discern any "basis in fact" for it. Estep v. United States, 1946, 327 U.S. 114, 122, 66 S.Ct. 423, 90 L.Ed. 567. However, where the claimed exemption is denied on the ground that the applicant lacks sincerity, disbelief will not suffice "unless there is some affirmative evidence to support the rejection of the claimed exemption or there is something in the record which *substantially* blurs the picture painted by the registrant and thus casts doubt on his sincerity." Kessler v. United States, 5 Cir. 1969, 406 F.2d 151, 156 (citation omitted) (emphasis in original). As this Court has said in Helwick v. Laird, 5 Cir. 1971, 438 F.2d 959, 963: "There must be some facts in his application—hard, provable, reliable facts—that provide a basis for disbelieving the claimant."

Though it is difficult definitely to ascertain from his brief or from oral argument, Silverthorne seemingly seeks reversal of the district court with respect to his conscientious objector claim on two theories: (1) that the CORB could not properly consider certain statements made by him, and that absent such consideration no basis in fact existed for the denial of his claim; and (2) that

even if the CORB could consider the statements at issue there was not sufficient basis in fact to deny his claim. Before considering the merits of his attack some view of the facts is in order.

## B. *The Factual Setting.*

On August 13, 1970, Silverthorne was drafted into the United States Army. After spending a short time in basic training, he applied for, and received, an in-service conscientious objector classification (1–A–O, noncombatant).[1] Thereafter, on January 1, 1971, he was transferred to Fort Sam Houston, Texas, to receive medical corps training.

On January 6, 1971, Silverthorne gave notice of his intent to apply for a 1–O discharge. On January 14, 1971, he was requested to, and did, fill out both an Armed Services Security Questionnaire and a Statement of Personal History form. During the course of pleading before the district court, Silverthorne alleged that he was asked to complete these forms pursuant to some rather unusual instructions. According to Silverthorne, a staff sergeant told him that the copies of these forms which he had filled out upon entering the Service were missing and that in order to complete his 201 file he was to fill them out again. However, he was not to fill them out according to his present state of mind but *according to the state of mind he possessed on the date he entered the Service.*

In filling out the forms in question, Silverthorne made several important remarks. On his Statement of Personal History he said:

"I am a member of a facist organization, the United States Government.

S.D.S. [Students for a Democratic Society] and Y.S.A. [Young Socialists Alliance] both propose violent revolution. I am affiliated with both as a member and employee (writer). I engage myself in the activities of these organizations and support them financially. * * *

"I believe in the organizing of individuals to rise up against the state. I have always organized (i. e. first SDS Chapter at Kent State U) people and will continue to do so. I have taken part in attacks on Justice Dept. Nov. 15, 1969, Chicago police Oct. 1969, Kent State ROTC Bldg. I show no loyalty to this govt. I'm 1–A–O applying for 1–O discharge and refuse to harm people in the name of this country."[2]

On his Security Questionnaire, Silverthorne stated:

"I am presently a member of the 'Young Socialist Alliance' and 'Students for a Democratic Society' (Weatherman branch). I have written articles and supported these organizations both financially and spiritually the past several years. I attend their meetings whenever possible, correspond with them, and support them fully. I serve their cause in whatever capacity I can. I have a subscription to 'Ramparts' & 'Liberation' and buy the 'Militant' whenever possible.

"I do encourage the overthrow of our facist form of govt. I would like to see this done as nonviolently as possible but will use whatever measures need be. I am continuing this

---

1. It is well settled that the requisites for obtaining a 1–A–O classification are essentially those for obtaining a 1–O classification. In both cases the applicant must be sincerely opposed to war in any form and that conviction must be premised on religious principles as construed in *Welsh* and *Seeger, supra.* The only distinction is that in order to obtain a 1–A–O classification the applicant need only show that he cannot in consonance with his principles serve in a combatant status, while

to obtain a 1–O classification (and therefore a discharge) the applicant must show that he cannot serve in the Armed Forces in any capacity whatsoever.

2. Since Silverthorne noted on his Statement of Personal History that he intended to apply for a 1–O discharge, it would seem that he was not filling out the form in an attempt to express his state of mind as of the date he entered the Service but rather that he was expressing his present views.

goal in the Armed Services. All power to the people."

On February 1, 1971, Silverthorne filed application for a 1–O discharge. It was accompanied by a personal statement indicating that he was in fact a conscientious objector. Moreover, the application was accompanied by recommendations of approval from his unit commander, Lt. Barth, and from an Army Chaplain, both of whom had interviewed Silverthorne. (Lt. Barth failed to state specific reasons for his approval.) Major Sorenson, Adjutant, also recommended approval but without benefit of an interview. (Letter dated February 11, 1971, stating no reasons.) Colonel McCaleb, the commander of USAMEDTC to which Silverthorne was attached, also recommended approval of the application without an interview in a letter dated February 8, 1971. Therein Colonel McCaleb stated that he believed Silverthorne to be a "confirmed and experienced revolutionary" interested in "damaging the United States Army." McCaleb also stated that he considered Silverthorne to be the "single greatest threat" to his command and that he regarded it "as a matter of singular importance" to remove Silverthorne from his organization. McCaleb also stated that Silverthorne would never perform one day of useful service to the military and that "it is in the best interest of the United States Army that he be separated from the service by the *fastest* means possible no matter how appropriate it may or may not be." (Emphasis in original.) Finally, Major Mock, Silverthorne's battalion commander, and Colonel Miller, Commanding General of the Fourth Army, recommended approval without either an interview or a statement of reasons.

On April 5, 1971, the Department of the Army forwarded the following letter to the Commanding General of the Fourth Army, Colonel Miller:

"1. The separation of Private Donald D. Silverthorne, Jr. * * * is disapproved.

"2. Army policy requires that applications from individuals for classification as conscientious objectors be processed regardless of other contemplated personnel action.

"3. Accordingly, this application is being returned for compliance with paragraph 4b(4) (b) 1, AR 635–20 [which requires that] the reasons for unit commander's recommendations be furnished.

"4. If Private Silverthorne's commanders feel that he should be separated as unsuitable or undesirable, they should process the request in accordance with AR 635–212."

Before a response could be had to that letter, Silverthorne, on April 12, 1971, filed another Security Questionnaire and Statement of Personal History at his own behest. On his Personal History form, he stated:

"I consider myself a member of a facist organization by being drafted and forced to give allegance [sic] and serve in the United States military. I *was* affiliated with S.D.S. & Y.S.A. *prior* to my entry into the service. I supported them financially then and devoted my literary talents to their causes. I no longer consider myself a member of S.D.S. [This statement is followed by an illegible sentence which seems to indicate that he is also no longer a member of Y.S.A. and that he was only a member of these organizations as a nonviolent participant.] These activities existed prior to my induction in the Army. I do not at this time claim loyalty to the govt. as it now exists. I never have and never will knowingly injure another human being for any organization or country. I will continue to help & organize people in the name of peace.

 ※ ※ ※ ※ ※ ※

"I firmly believe the comments I made of 14 Jan. 71 on a like form as this to be too sarcastic and antagonistic. This attitude came about from earlier persecution I received that day. I do not believe (in fact I know) at this

time that those statements were not the best possible representation of my personal history. The above statements give a more complete view of my person." (Emphasis in original.)

On his Security Questionnaire, he said:

"I am not at this time a member of any organization [which advocates the violent overthrow of the government though I have been]. I work by myself in conjunction with Y.S.A. and other non-violent groups. I do not at this time claim any loyalty to the United States govt. and I do advocate by *non-violent actions* the alter [sic] or abolishment of the same or its policies.

"I do not believe in the use of violence, but I also do not believe that there is a constitutional method to abolish this govt. I do seek to alter the form of this govt. by possible unconstitutional means. I am not plotting with any outside groups dissident activities. I have the conscience of an individual and act accordingly." (Emphasis in original.)

Subsequent to Silverthorne's newly filed Statement of Personal History and Security Questionnaire and in response to the Department of the Army's letter of April 5, 1971, Lt. Barth, on April 13, 1971, again recommended approval of Silverthorne's application for 1–O, stating the following reasons:

"Based on several personal interviews with Private Silverthorne, it is the opinion of this unit commander that, even though this enlisted man has been involved with certain radical organizations, he is sincere in his beliefs concerning conscientious objection and is strongly motivated by his convictions which have been crystallized during his time on active duty."

Colonel Miller, Commanding General of the Fourth Army, retracted his recommendation for approval, stating in a lengthy letter dated April 30, 1971, that in light of Silverthorne's statements in his January 14 Security Questionnaire

and Statement of Personal History he believed Silverthorne was insincere. Furthermore, he stated that he did not believe that the self-serving statements contained in Silverthorne's subsequently filed Security Questionnaire and Statement of Personal History were true. Major Sorenson also withdrew his recommendation, stating that "the applicant more properly should be eliminated from service for other reasons." Finally, Colonel McCaleb retracted his recommendation of approval since in his opinion Silverthorne's statements contained in the Security Questionnaire and Statement of Personal History of January 14, 1971, indicated a lack of sincerity.

On May 24, 1971, the CORB denied Silverthorne's application for 1–O discharge. In a six-page opinion, the Board reasoned that Silverthorne "lacks the depth of conviction required to qualify for discharge as a conscientious objector." In part the Board stated the following reasons:

"The biggest factor indicating a lack of depth to applicant's professed beliefs is the statement that he made on his personal history questionaire [sic] dated 14 January 1971, approximately two weeks before this application as a conscientious objector was submitted. On this official document and over his signature, applicant stated that he was a member of an organization, association, movement, group or combination of persons advocating the overthrow of our constitutional government or which has adopted the policy of advoating or approving the commission of acts of violence or force to deny other persons their rights under the Constitution of the United States or which seeks to alter the form of government of the United States by unconstitutional means.[3] * * * These are clearly not the statements of an individual who is deeply committed to the principles of nonviolence based upon moral, ethical or religious convictions. It seems to the Board that

3. For text of Silverthorne's statements see p. 1180, *supra.*

a true conscientious objector could not indicate, no matter what the situation or provocation, that he could support the use of violence in attaining any goals. Such statements, even in jest, could not be made by a true CO. The fact that applicant can even make the statements as quoted above casts great doubt upon the depth with which he holds his professed beliefs. In April 1971 applicant then submitted a second statement of personal history, apparently to clear up the statements in the January document.[4] These statements [made in April] still indicate clearly that prior to his entry into the Army applicant was able to support and serve institutions which, by applicant's own admission, practiced violent methods of attaining their goals. At that time, he was quite able to aid such institutions consistent with his conscientious beliefs against the use of violence. This fact casts great doubt upon the depth of applicant's present statement that he cannot participate in the Army in any manner because to serve in the Army is to support immoral violence. In his letter of 12 April 1971, submitted in rebuttal to the statement of COL Foster C. McCaleb, Jr., applicant cites the reference letters submitted with this application as being an indication that he was opposed to violence and 'against participating in any organization which uses violence to justify its end' prior to his entry into the Army. He states, 'This was correct then and is correct now, the only difference being that today I feel that even being a medic in any capacity in any base in the Army is contributing to violence.' The Board has read the reference letters submitted in support of this application but finds them completely rebutted by applicant's statements of 14 January and April 1971 which indicate that he was quite able, consistent with his conscience, to participate in and support groups and activities which he knew to be engaged in acts of violence. Because of the inconsistencies in the two personal history and security questionnaire [sic] documents submitted by applicant the Board must conclude that applicant was less than truthful in one of those documents. This also casts grave doubt upon applicant's integrity and the depth of his religious, moral or ethical convictions. Applicant stresses the fact that he is against the use of violence, but because it is difficult to tell when applicant is telling the truth and when he is not, the Board cannot belive [sic] that applicant's convictions are deeply ingrained within him."

C. *Conclusions.*

Bearing in mind the facts and the opinion of the CORB, we now consider whether there was an adequate basis in fact for the CORB's denial of Silverthorne's application. First, however, a threshold question must be answered. Silverthorne alleges that it was improper for the Review Board to consider statements he made in his January 14 Security Questionnaire and Statement of Personal History. He bases this contention on three grounds:

(1) That the Department of the Army letter, dated April 5, 1971, specifically forbade consideration of the forms in question;

(2) that the forms in question are emblazoned with the phrase "The information hereon is for official use only and will be maintained in confidence," and that accordingly information contained therein could not be considered in connection with Silverthorne's 1–O application; and

(3) that Silverthorne filled out the forms on January 14, 1971, to reflect his attitude as of the date of his entry into the Army and as such they bear no relation to his present state of mind.

4. For text of Silverthorne's statements see p. 1181, *supra.*

■ Put shortly, none of these three contentions has merit:

(1) *The Department of the Army letter.*

The letter to Silverthorne's Commanding General, Colonel Miller, is set out at pages 1180, *supra.* Nothing therein in any way implies that the forms filled out by Silverthorne could not be considered in connection with his application for a 1–O discharge. Moreover, AR 635–20 ¶ 4b(5) makes specific reference to allowing inclusion in a conscientious objector application of any material contained in the applicant's 201 file. Both the Security Questionnaires and the Statements of Personal History are properly includable therein.

(2) *"For Official Use Only."*

That the Security Questionnaires and the Statements of Personal History were marked "for official use only to be held in confidence" does not prevent their consideration in connection with the application. This contention is amply met by the Government. Briefly stated, Army regulations make it clear that the notation in question means that such documents are not to be disseminated to the public. However, such a notation is not a security classification like, for example, "TOP SECRET" or "SECRET." According to AR 340–16 ¶ 4, "Material considered to be FOR OFFICIAL USE ONLY . . . . may be exchanged freely between components and individuals of the Department of Defense." Clearly, then, the CORB has access to the records here at issue.

(3) *The relevancy of the documents.*

■ Silverthorne contends that he filled out the Security Questionnaire and the Statement of Personal History on January 14 to reflect an earlier attitude. That contention is not supported by the facts. On his Security Questionnaire and Statement of Personal History filed April 12, 1971, he makes no such allegation. Rather he states that he wishes to revise the January 14 forms because he answered these in a state of particular aggravation caused by harassment received *that* day. Moreover, even in the forms filed January 14, 1971, he notes that he is a 1–A–O applying for a 1–O. That statement implies that he was completing the forms so as to reflect his current state of mind.

We conclude that the Security Questionnaires and the Statements of Personal History were properly before the CORB.

■ Silverthorne also contends that it was improper for any officer other than Lt. Barth to file a recommendation with the CORB. In support of that contention, he cites AR 635–20 and the Department of the Army letter dated April 5, 1971. Again, perusal of the letter in question does not reveal that recommendations from other than Barth were prohibited. Notably the letter was addressed to the Commanding General of the Fourth Army, not to Lt. Barth. With respect to AR 635–20, ¶ 4b(5) thereof indicates that such recommendations are permissible. That paragraph provides in part for the inclusion of "[s]ubsequent forwarding comments" and this authorization does not appear limited as to who may furnish the comments. Most important, though, is that the CORB relied far more on Silverthorne's statements in his application, in his Security Questionnaires, and in his Statements of Personal History than on any recommendation.[5] Even if it was error to consider the challenged recommendations (and we do not think it was), it would be harmless.

---

5. That the Review Board did not rely on the recommendations also militates against Silverthorne's argument that command influence prevented him from obtaining a 1–O in that, owing to the letters of high officers, no lower ranking officers would recommend his discharge. More-over, Lt. Barth did recommend approval in the face of his brethren's contrary views. Certainly Silverthorne could not contend that command influence affected the Review Board directly. In no way is the Board subservient to those in the chain of command above Silverthorne.

█ This brings us to the ultimate issue: Whether considering the Security Questionnaires and the Statements of Personal History the CORB had an adequate basis in fact to deny the application. Though the Board phrased its denial in terms of lack of depth of conviction, it obviously meant lack of sincerity.[6] As such, the opinion of the CORB does not run afoul of *Helwick, supra,* wherein this Court noted that "depth and maturity" of one's views is not a proper consideration. It is apparent that the Review Board in this case was not alluding to the maturity of Silverthorne's convictions but to his sincerity.

█ The CORB found a lack of sincerity on two grounds. First, it credited as true Silverthorne's statements contained in the January 14 Security Questionnaire and Statement of Personal History. Clearly those statements do reflect a lack of sincere objection to war in any form.[7] It was within the Review Board's discretion to credit those statements as true. As such it would seem that Silverthorne's sincerity is substantially blurred within the meaning of *Kessler, supra.* Secondly, the existence of inconsistencies between Silverthorne's statements in his application and in the April 12 Security Questionnaire and Statement of Personal History, on the one hand, and in his January 14 Security Questionnaire and Statement of Personal History, on the other, connoted a lack of sincerity. Such an inference is valid and has been held to constitute a basis in fact. Carson v. United States, 5 Cir. 1969, 411 F.2d 631, 633.

## II. *The AR 635–212 Claim*

Following the CORB's denial of Silverthorne's request for a 1–O discharge, his company commander ordered him to a psychiatrist to be evaluated for possible discharge pursuant to AR 635–212. Briefly stated, that regulation allows the Army to rid itself of those soldiers found to be unsuitable or unfit for further military duty. The psychiatrist recommended separation of Silverthorne as unsuitable upon the findings quoted in the margin.[8] However, the company commander took no further steps to discharge him.

█ Silverthorne asked the district court to order his discharge, contending

6. As noted in Kurtz v. Laird, 5 Cir., 1972, 455 F.2d 965, 967 n. 2, "This phrase [lack of depth of conviction] was apparently coined in Jennings v. Laird, W. D.Tex.1971, 333 F.Supp. 335, as a parallel to sincerity in a *Welsh* type case."

7. The Board concluded in part "that a true conscientious objector could not indicate, no matter what the situation or provocation, that he could support the use violence in attaining *any* goals." (Emphasis supplied.) We think that statement too extreme. For one need not be a total pacifist to qualify for conscientious objector status. *E. g.*, Mayfield v. United States, 5 Cir. 1955, 220 F.2d 729 (violence in self defense is not inconsistent with concientious objection). *Accord*, Moon v. United States, 5 Cir. 1955, 220 F.2d 730. All that is necessary is that the applicant be opposed to *war* in any form. Nonetheless, we agree with the Board's finding that Silverthorne's statements indicate a lack of sincere opposition to war in any form. He would, under some circumstances, participate in "or-

ganized" and "violent" overthrow of our present system of government. In our view such conduct would constitute war in some form.

8. "a. THAT The diagnosis is: Passive-aggressive personality, obstinate, negativistic behavior, refusal to cooperate with the military in any way, refusal to perform any useful military duty.

"b. THAT This is a character-behavior disorder of long duration which is unlikely to respond to rehabilitation within the military service.

"c. THAT This man is able to distinguish the difference between right and wrong, to adhere to the right, and has the mental capacity to understand and participate in any action taken in his case.

"d. THAT There are no mental defects or derangements present which would warrant consideration by a PEB or other disposition through medical channels."

that in light of the psychiatrist's recommendation no basis in fact existed for the Army's failure to separate him. The district court refused, holding that it was "without jurisdiction to order the military to act in this matter." We are in agreement with the view of the trial judge.

 We are aware of the general principle that once the Army promulgates regulations, it is bound to follow them. *See* Pitcher v. Laird, 5 Cir. 1970, 421 F.2d 1272 (*conscientious objector case*). In the context of the conscientious objector regulation, AR 625–20, it has been repeatedly recognized that the Army cannot apply its rules in an arbitrary manner and that when it does so the courts have power to review. *E. g., Helwick, supra; Pitcher, supra.* The conscientious objector provisions were promulgated for the benefit of the soldier. The soldier has the right to request a discharge pursuant to those regulations.

In contradistinction AR 635–212 exists for the benefit of the Army. As the district court noted: "[T]he regulation is designed to enable the Army to purge itself of undesirable and unproductive soldiers." (Footnote omitted.) Moreover, the soldier has no right to apply for discharge as unfit or unsuitable. Rather, it is the unit commander who must initiate these proceedings. He did so in this case by sending the prospective dischargee to a psychiatrist.[9] Upon receiving the psychiatric report, the commander *may* recommend discharge as unsuitable:

"When the immediate commander determines that the best interest of the service will be met by elimination action for unsuitability, he will forward his recommendation in letter form to the officer exercising special court-martial jurisdiction. * * *" AR 635–212 ¶ 12b. (Paragraph 12a provides similar procedure for elimination because of unfitness.) However, we emphasize that nothing in the regulation requires the unit commander to make such a recommendation. He may in the exercise of his judgment choose to let the matter come to rest, even in the face of a psychiatric recommendation for discharge. Surely, as the district court opined, "[i]t would be absurd to hold that the Army may not disregard a [psychiatrist's] recommendation * * *." Whether to discharge a soldier pursuant to AR 635–212 is a command decision, not a medical one.

Owing to the distinctions between AR 635–212, on the one hand, and regulations such as AR 635–20, on the other, we are without power to review the Army's exercise of discretion in this case—even to the limited extent of searching for a basis in fact. Clearly the company commander's failure to process Silverthorne for discharge after receiving the psychiatrist's report was an exercise of his discretion. And it was within his discretion to refuse to recommend Silverthorne for discharge.

 Our power in this matter is limited to requiring the Army to comply with its ministerial duties enumerated in AR 635–212. *See* Marbury v. Madison, 1803, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60. For example, the regulation provides a right of counsel to any soldier whom the Army subjects to the provi-

---

9. Appellees contend that Silverthorne's company commander did not initiate AR 635–212 proceedings by sending Silverthorne to the psychiatrist. They insist that it was Silverthorne's counsel who suggested that the mental examination be made. However, the company commander specifically requested the psychiatrist to make a recommendation as to the appropriateness of a discharge pursuant to that regulation. There is no evidence in the record that Silverthorne's counsel was the motivating force, but even if he was, Silverthorne's company commander certainly was not bound to comply with the suggestion. Hence, the commander must be charged with having of his own will ordered Silverthorne to the psychiatrist. And in our opinion his request that the psychiatrist evaluate Silverthorne for a possible AR 635–212 discharge (a step specifically contemplated by the regulation) constituted an initiation of the proceedings. We go forward on that theory.

sions of the regulation. ¶ 10a(c). Were the Army to refuse that right, we would be empowered to order compliance therewith. *Id.* Similarly we might order the Army actually to exercise the discretion provided by the regulation where, in a case unlike this one, it has failed to do so. But in no case could we dictate that the Army exercise its discretion one way or the other. *See* Carter v. Seemans, 5 Cir. 1969, 411 F.2d 767.

In short, we hold that Silverthorne's unit commander, in failing to take further steps upon receipt of the psychiatrist's recommendation, exercised his discretion and that we are powerless to review the correctness of the commander's action.[10]

*Conclusion.*

In sum the CORB had an adequate basis in fact for denying Silverthorne's conscientious objector claim, and the district court was correct in holding that it lacked jurisdiction to review the AR 635–212 claim. Accordingly, the judgment is in all respects

Affirmed.

## ON PETITION FOR REHEARING AND PETITION FOR REHEARING EN BANC

PER CURIAM:

On petition for rehearing appellant contends that our original opinion is inconsistent with Mindes v. Seaman, 5 Cir. 1971, 453 F.2d 197, insofar as we have denied relief under Army Regulation 635–212. In *Mindes* a panel of this Court noted that dismissals for want of jurisdiction should be sparingly used but that nonetheless we "should not review internal military affairs in the absence of * * * an allegation of the deprivation of a constitutional right, or an allegation that the military has acted in violation of applicable statutes or its own regulations * * *." 453 F.2d at 201.

In this case Silverthorne alleges that the Army failed to abide by the terms of Army Regulation 635–212. Seemingly, then, his claim should not have been dismissed for lack of jurisdiction. Nonetheless, the Court in *Mindes* averred that where the " 'federal claim is frivolous' " such a dismissal is appropriate. 453 F.2d at 198, *quoting* C. Wright, Law of Federal Courts 62 (2d ed. 1970). In our view Silverthorne's claim is frivolous. Thus, even if the rationale of *Mindes* is applicable to this case, we would still dismiss for want of jurisdiction. As we pointed out in our earlier opinion, the Army was possessed of wide discretion in refusing to discharge Silverthorne as unfit or unsuitable for further duty. It was not bound to accept the psychiatrist's recommendation for dismissal. Silverthorne has pre-

10. We are aware of Allgood v. Kenan, N. D.Cal.1969, 2 SSLR 3145, and of Patterson v. Stancliff, D.Vermont 1971, 330 F.Supp. 110, in which judicial review of AR 635–212 proceedings was had. In each case the court applied the "no basis in fact" standard to the Army's refusal to discharge petitioner.

In *Allgood* the petitioner's commanding officer ordered a mental examination. The psychiatrist recommended discharge. The discharge was denied. After noting that the petitioner "had sought" an AR 635–212 discharge the court reasoned that the Army had no basis in fact for denying the discharge. We emphasize that the soldier has no right to apply for separation under AR 635–212, and for that reason we are of the opinion that *Allgood* was decided on a false premise and should not be followed.

In *Stancliff* the petitioner underwent a mental examination. Both the psychiatrist and his immediate commander recommended discharge pursuant to AR 635–212. The Army officially denied the request. The court reasoned that, once petitioner had been processed through all channels and a ruling had been obtained from the ultimate authority, he was entitled to have that ruling reviewed for a basis in fact. In this case we are not faced with a ruling from the highest Army authority. Silverthorne was not fully processed through all steps provided by AR 635–212. Although we express no view as to the correctness of the *Stancliff* decision, we limit it strictly to its facts and hence choose not to follow its rationale in this case.

sented no evidence to support his contention that the Army abused its discretion.

Moreover, this Court in *Mindes* noted with approval Reaves v. Ainsworth, 1911, 219 U.S. 296, 31 S.Ct. 230, 55 L.Ed. 225. In that case an officer was refused promotion in light of an Army medical board finding that he was unfit for such duty. Reaves urged that the medical board had acted in an arbitrary and capricious manner. The Supreme Court refused even to reach the merits of his claim. *Reaves* is like this case. For us to rule on the merits of Silverthorne's fitness or suitability would require the same type of review of medical records which the Supreme Court decried in *Reaves*.

The Petition for Rehearing is denied and no member of this panel nor Judge in regular active service on the Court having requested that the Court be polled on rehearing en banc (Rule 35 Federal Rules of Appellate Procedure; Local Fifth Circuit Rule 12), the Petition for Rehearing En Banc is denied.