**L.W. LAIRD, et al.,**
**Plaintiffs–Appellants,**

v.

**INTEGRATED RESOURCES, INC., et al., Defendants–Appellees.**

No. 89–2201.

United States Court of Appeals,
Fifth Circuit.

April 6, 1990.

Order on Denial of Rehearing
May 2, 1990.

Thomas W. Moore, Moore & Moore, Veda
A. Moore, C. Michael Clark, David T. Mad-

dox, Houston, Tex., for plaintiffs-appellants.

K. Charles Peterson, Reynolds, White, Allen & Cook, Houston, Tex., for defendants-appellees.

Charles W. Schwartz, David C. Holmes, Vinson & Elkins, Houston, Tex., J. Lawrence Blades, Myerson & Kuhn, New York City, for Planning Ahead, Inc. and Jack Socrcic.

Before GOLDBERG, POLITZ and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

## I. THE FACTS

Laird, Underwood, and Hannington, the plaintiffs in this suit, (the "plaintiffs") are employees of the LEM Construction Company Inc. ("LEM"). They also serve as trustees for the benefit of the LEM Profit Sharing Plan and Trust ("Trust"). LEM established the trust to benefit its approximately 200 employees.

The plaintiffs wanted professional assistance in managing the Trust. Consequently, they interviewed Jack Sorcic, one of the defendants, and hired him for $125 per hour. Sorcic is the president of Planning Ahead, a registered investment adviser, also a defendant. Unbeknownst to the plaintiffs, Sorcic also served as a registered representative of Integrated Resources. Integrated Resources marketed investment securities and paid its brokers commissions for the sale of these securities. Integrated Resources Marketing and Integrated Resources Equity Corporation are subsidiaries of Integrated Resources. All are defendants in this suit. Integrated Resources sponsored or approved all of the securities Sorcic recommended and sold to the plaintiffs. Because Sorcic was a registered representative of Integrated Resources, he earned commissions for all of these sales.

The record is unclear whether Sorcic, through Planning Ahead, properly disclosed to the plaintiffs information required of investment advisers by Securities and Exchange Commission regulations.[1] Securities and Exchange Regulation 17 CFR section 275.204–3 states, in relevant part, that "an investment adviser ... shall ... furnish each advisory client and prospective advisory client with a written disclosure statement which may be a copy of Part II of its form ADV."[2] The form "ADV part II" referred to in these regula-

---

1. Securities and Exchange Commission regulation 17 CFR section 275.204–3 states, in pertinent part:

(a) General requirement. Unless otherwise provided in this rule, an investment adviser, registered or required to be registered pursuant to section 203 of the Act, shall, in accordance with the provisions of this section, furnish each advisory client and prospective advisory client with a written disclosure statement which may be either a copy of Part II of its form ADV which complies with section 275.2054–1(b) under the Act or a written document containing at least the information then so required by Part II of Form ADV. (b) Delivery. (1) An investment adviser, except as provided in paragraph (2), shall deliver the statement required by this section to an advisory client or prospective advisory client (i) not less than 48 hours prior to entering into any written or oral investment advisory contract with such client or prospective client, or (ii) at the time of entering into any such contract, if the advisory client has a right to terminate the contract without penalty within five business days after entering into the con-

tract. (2) Delivery of the statement required by paragraph (1) need not be made in connection with entering into (i) an investment company contract or (ii) a contract for impersonal advisory services. (c) Offer to deliver. (1) An investment adviser, except as provided in paragraph (2), annually shall, without charge, deliver or offer in writing to deliver upon written request to each of its advisory clients the statement required by this section. (2) The delivery or offer required by paragraph (c)(1) of this section need not be made to advisory clients receiving advisory services solely pursuant to (i) an investment company contract or (ii) a contract for impersonal advisory services requiring payment of less than $200; (3) *With respect to an advisory client entering into a contract or receiving advisory services pursuant to a contract for impersonal advisory services which requires payment of $200 or more, an offer of the type specified in paragraph (c)(1) of this section shall also be made at the time of entering into an advisory contract.*
(emphasis added).

2. *Id.*

tions discloses that Sorcic: (1) completed securities transactions for compensation as a broker; (2) possessed an interest in the securities that he recommended to investment advisory clients; (3) worked as a registered representative of Integrated Resources; and, (4) received commissions on Integrated Resources products purchased by clients.

Simpson, LEM's office manager, took notes at Sorcic's interview. According to Simpson's notes, Sorcic stated that he worked for an hourly fee because "he did not want to have to be in a position to get you to buy something in order to make a commission." In addition, Simpson testified that Sorcic did not mention his affiliation with Integrated Resources, a brokerage company. Laird and Hannington also testified that Sorcic did not disclose that he received commissions on the investments he recommended.

The contract between Planning Ahead and the plaintiffs stated that Sorcic received an hourly fee for his services. The contract states that Planning Ahead would:

> [provide] investment advice and furnish recommendations to the profit sharing plan as to the allocation of present financial resources among different types of assets with a view toward better correlating the assets with the Advisory Client's investment objectives.... The Advisory Client shall pay P.A. [Planning Ahead] for investment services provided, a fee of $125.00 per hour.... Implementation of the plan is entirely at the discretion of the Advisory Client.

The Trust suffered significant losses from the investments Sorcic recommended. When the plaintiffs learned, after the contract expired, that Sorcic was earning commissions, they filed suit in state court in Fort Bend County, Texas. In this lawsuit, the plaintiffs sought recovery under seven theories: (1) common law fraud; (2) breach of fiduciary duties; (3) breach of contract; (4) rescission of the contract based on fraud; (5) violation of the Texas Deceptive Trade Practices–Consumer Protection Act; (6) gross negligence in making investment recommendations; and (7) violation of the Texas Securities Act.

Approximately one year later, the plaintiffs sued Sorcic, Integrated Resources, and Planning Ahead in federal court. In this suit, the plaintiffs asserted three claims: (1) violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5 passed under this act; (2) violation of the Racketeer Influenced Corrupt Organization Act ("RICO"); and (3) violation of the Investment Advisers Act of 1940. The plaintiffs also sought judgment against the Integrated Resources defendants alone for: (1) common law fraud; (2) recission of the investments; and, (3) violation of section 27.01 of the Texas Business and Commerce Code.

While the state court action was pending, Sorcic and Planning Ahead filed a motion for summary judgment in the federal action. The Integrated Resources defendants did not seek summary judgment. The trial court on its own motion named the Trust as a party to the federal court action and then granted summary judgment in favor of Sorcic and Planning Ahead.

Even though *Jot–Em–Down* says "write-em-up," the district court did not file an opinion.[3] We must thus "wring-out" the transcript of the summary judgment hearing to discern the district court's rationale. Apparently, the district court ruled in favor of Sorcic and Planning Ahead for three reasons. First, the parol evidence rule barred consideration of Sorcic's alleged statements that he did not receive commissions because Sorcic made those statements prior to the signing of the contract. Second, Sorcic and Planning Ahead's disclosures were adequate as a matter of law

**3.** *Jot–Em–Down Stores Inc. v. Cotter & Co.,* 651 F.2d 245, 247 (5th Cir.1981) ("While the Federal Rules of Civil Procedure do not require a statement of reasons by a trial judge granting a motion to dismiss, a summary judgment or a directed verdict, we have often stated that a reasoned statement is helpful not only to counsel but also to the appellate court.... In all but the simplest case, such a statement usually proves not only helpful but essential."); *See also Coats v. Pierre,* 890 F.2d 728, 731 (5th Cir.1989).

because: (1) various authorization forms and confirmation slips sent to the plaintiffs stated that Sorcic was a registered representative of Integrated Resources; and (2) the prospectuses sent to the plaintiffs stated that the registered representative received a commission for the sale of the particular investment. Based on these latter two factors, the district court reasoned that the plaintiffs should have realized that Sorcic received commissions for the investments he recommended. Finally, the court dismissed the plaintiff's RICO counts reasoning that they were based on Sorcic's alleged failure to disclose under rule 10(b)–5.

After the district court granted summary judgment to Sorcic and Planning Ahead, Integrated Resources signed a "Stipulated Order of Dismissal" with the plaintiffs. The order conditionally dismissed the Integrated Resources defendants from the federal action. The dismissal was subject to Integrated Resources being rejoined if the summary judgment was reversed on appeal. The district court then granted Sorcic and Planning Ahead's application for a preliminary injunction against the plaintiffs. The injunction: (1) prohibited the plaintiffs from prosecuting the state court action pending final disposition of this appeal; and (2) required the plaintiffs to dismiss the state court action if this court affirmed the summary judgment.

The district court ruled that Sorcic and Planning Ahead were entitled to summary judgment as a matter of law.[4] We exercise de novo review to determine whether this ruling was correct.[5]

## II. THE RELATIONSHIP BETWEEN THE PAROL EVIDENCE RULE AND RULE 10(b)–5

■ We stated that the parol evidence rule cannot operate to exclude evidence of fraud under rule 10(b)–5 in *Grainger v. State Security Life Insurance Company*.[6] *Grainger* was an action brought by purchasers of insurance contracts against an insurance company under rule 10(b)–5. The issue was whether the contracts were securities.[7] The resolution required, among other factors, consideration of the companies' sales methods.[8] Responding to the argument that the parol evidence rule barred evidence of the companies' promotional efforts, the *Grainger* panel stated:

> [e]ven if we were to hold that the parol evidence rule applied in the case before us, it still by its own terms would not operate to bar evidence of the oral representations made by Great States salesmen [the insurance company].... [P]laintiffs' 10b–5 cause of action is a fraud-based cause of action.... Traditionally, the parol evidence rule will not operate to exclude parol evidence introduced to show fraud.[9]

This ruling is sound. The *Grainger* panel recognized that 10(b)–5 is a fraud-based

---

**4.** Rule 56(c) of the Federal Rules of Civil Procedure provides, in pertinent part, that: "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See USX Corp. v. Tanenbaum*, 868 F.2d 1455, 1457 (5th Cir.1989) ("On review of the grant of summary judgment we may affirm if, after examining the entire record we are convinced that there is no genuine dispute of a material fact and that the moving party is entitled to judgment as a matter of law."); *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 527 (5th Cir.1987) ("The granting of summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is appropriate when, viewed in the light most favorable to the opposing party, no genuine issue of material

facts exists and the movant is entitled to judgment as a matter of law.... On review, this Court applies the same legal standard in determining whether summary judgment was proper....")

**5.** *USX Corp. v. Tannenbaum*, 868 F.2d 1455, 1457 (5th Cir.1989) ("[Q]uestions of law are subject to de novo review."); *Netto v. Amtrak*, 863 F.2d 1210, 1213 (5th Cir.1989) ("The appellate court decides questions of law, however, just as it decides questions of law outside the summary judgment context: de novo.").

**6.** 547 F.2d 303, 306 (5th Cir.1977).

**7.** *Id.* at 304.

**8.** *Id.* at 306.

**9.** *Id.* at 307 n. 11.

cause of action [10] and that the parol evidence rule does not bar evidence of fraud.[11] By admitting parol evidence to assess rule 10(b)–5 claims, the panel promoted the fundamental purpose of the Securities Act of 1934 " . . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus . . . achieve a high standard of business ethics in the securities industry." [12] Application of the parol evidence rule to rule 10(b)–5 is thus inimical to rule 10(b)–5's purpose, the elimination of fraud in securities transactions, and would eviscerate the protection the Act affords to the investing public.

In the present case, the district court incorrectly applied the parol evidence rule by excluding statements Sorcic allegedly made before executing the investment advisers contract. This decision could allow a possible instance of fraud, Sorcic misrepresentations or failure to disclose, to remain unnoticed in a rule 10(b)–5 claim. On remand, the district court must consider the plaintiffs', Simpson's, and Sorcic's testimony, and any other circumstances surrounding the execution of the contract.

## III. THE STANDARD OF DISCLOSURE FOR INVESTMENT ADVISERS UNDER RULE 10(b)–5

One of the elements that a plaintiff must prove to establish liability under rule 10(b)–5 is a material misrepresentation or

---

**10.** *Herman & MacLean v. Huddleston,* 459 U.S. 375, 386, 103 S.Ct. 683, 689, 74 L.Ed.2d 548 (1983) (Refers to "the broad proscription against fraud in section 10(b) would be undermined if its scope were restricted by the existence of an express remedy under section 11."). *Chiarella v. United States,* 445 U.S. 222, 226, 100 S.Ct. 1108, 1113, 63 L.Ed.2d 348 (1980) ("Section 10(b) was designed as a catch-all clause to prevent fraudulent practices."); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 152, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) ("The Court has said that the 1934 Act and its companion legislative enactments embrace a 'fundamental purpose . . . to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus achieve a high standard of business ethics in the securities industry.' *SEC v. Capital Gains Research Bureau,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963). In the case just cited the Court noted that Congress intended securities legislation enacted for the purpose of avoiding frauds to be construed 'not technically and restrictively, but flexibly to effectuate its remedial purposes.' Id., at 195 [84 S.Ct. at 284] . . . ."); *Meyers v. Moody,* 693 F.2d 1196, 1214 (5th Cir.1982) ("Although the common law of fraud is generally more stringent in its requirements than the elements of Rule 10b–5, it is clear that the two are closely related."); *Wood v. Combustion Engineering Inc.,* 643 F.2d 339, 345 (5th Cir.1981) ("[W]e initially observe that the cause of action under 10b–5 is essentially 'fraud like' in character."); *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579, 589 (5th Cir. 1974) ("Rule 10b–5 has a specific and narrow task—to protect purchasers and sellers of securities from fraud . . . ."); *Azalea Meats Inc. v. Muscat,* 386 F.2d 5, 8 (5th Cir.1967) ("It is important, however, to note, though gratuitously, that conceptually the gravamen of an action brought under section 10(b) of the Securities and Exchange Act of 1934 is fraud . . . ."); 3 Fletcher Cyclopedia of Corporations, section 900.3 (perm. ed. 1986) ("The general purpose and intent of the broad anti-fraud provisions of Section 10(b) and Rule 10b–5 is to protect investors, to prevent inequitable and unfair practices and to insure fairness in securities transactions generally . . . ."); Clark, Corporate Law, section 8.9 (1986) ("[Section] 10b–5 originated in the need, which became more pressing with the rise of the modern corporation and the national securities markets, to transcend the gaps and limits of the common law actions available to securities traders injured by false representations or failures to disclose.")

**11.** *Marbury–Pattillo Construction Co. v. Bayside Warehouse Co.,* 490 F.2d 155 (5th Cir.1974) ("A wooden, purely mechanical, application of the parol evidence rule to this factual situation could convert the rule into a shield for fraud, an intolerable result . . . ."); *Hinds v. Plantation Pipe Line Co.,* 455 F.2d 902, 906 (5th Cir.1972) ("[F]raud is clearly an exception to the parol evidence rule . . . ."); *Harville Rose Service v. Kellogg Co.,* 448 F.2d 1346, 1351 (5th Cir.1971) ("Since there is no evidence of fraud . . . we hold that the district court was required to withhold from the jury's consideration the evidence of the alleged oral promises."); Restatement (Second) Contracts section 214 (1981) (Entitled "Evidence of Prior or Contemporaneous Agreements and Negotiations: Agreements and negotiations prior to or contemporaneous with the adoption of a writing are admissible in evidence to establish . . . (d) illegality, fraud, duress, mistake, lack of consideration, or other invalidating clause; . . . ."); 4 Williston, Contracts, section 631 (3rd ed. 1961) ("[E]vents antecedent to the making of the contract which negate mutuality of assent, such as . . . fraud . . . may also be the subject of parol evidence.").

**12.** *S.E.C. v. Capital Gains Research Bureau Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963).

omission in the purchase or sale of securities.[13] The evidence barred by the parol evidence rule in this case is crucial to this element. Once garnered, this evidence must be measured against Sorcic's duty to disclose and/or the standard for determining whether Sorcic made misrepresentations.

■ The standard for misrepresentation is whether the information disclosed, understood as a whole, would mislead a reasonable potential investor.[14] The scope of this standard is determined by the relative status and sophistication of the parties. Identical considerations underpin the duty to disclose. It is thus significant that Sorcic wears a badge of knowledge—he is an investment adviser.[15]

The Supreme Court recognized the fiduciary status of the investment adviser

13. *Abell v. Potomac Insurance Co.,* 858 F.2d 1104, 1119 n. 14 (5th Cir.1988) ("To state a claim under rule 10b–5, a plaintiff must allege either that the defendant misrepresented material facts or omitted material facts which a pre-existing duty required it to disclose to the plaintiff."); *Stephenson v. Paine Webber Jackson & Curtis Inc.,* 839 F.2d 1095, 1098 (5th Cir.1988) ("In order to demonstrate a violation of Rule 10b–5, the plaintiff must prove (1) a material misrepresentation or omission by the defendant, (2) scienter on the part of the defendant, (3) reliance, and (4) due diligence by the plaintiff to pursue his or her own interest with care and good faith."); *Shivangi v. Dean Witter Reynolds Inc.,* 825 F.2d 885, 888 n. 6 (5th Cir.1987) ("To establish a claim for relief under Rule 10b–5, the ... [plaintiffs] had to prove: (1) a misrepresentation or omission or other fraudulent device; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; (5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the fraudulent device ...); *Siebel v. Scott,* 725 F.2d 995, 1000 (5th Cir.1984) ("A claim under section 10(b) requires material misrepresentation, scienter, reliance, diligence, and injury."); *Warren v. Reserve Fund Inc.,* 728 F.2d 741, 744 (5th Cir.1984) ("In order to state a claim for relief under 10b–5, the plaintiff must establish (1) a misrepresentation or omission or other fraudulent device; (2) a purchase or sale of securities in connection with the fraudulent device; (3) scienter by defendant in making the misrepresentation or omission; (4) materiality of the misrepresentation or omission; (5) justifiable reliance on the fraudulent device by plaintiff (or due diligence against it); and (6) damages resulting from the fraudulent device."); *Chemetron Corp. v. Business Funds Inc.,* 718 F.2d 725, 728 (5th Cir.1983) ("We stress the importance of recognizing, of course, that every element of an offense under Section 10(b) must be met. There was never a doubt raised by our earlier opinion even when we denied the 10(b) remedy that the 10(b) elements had been proved. *Chemetron Corp. v. Business Funds Inc.,* 682 F.2d [1149 at] 1162 [5th Cir.1982]. The jury found that the stock manipulations constituted (1) a scheme relating to the purchase or sale of stock, which included (2) misstatements or omissions, (3) of material facts, (4) made with scienter, (5) upon which ... [the plaintiff] relied, (6) causing Chemetron's injury, and (7) touching upon the loss in value of the stock. These are the elements required by Section 10(b) of the statute and rule 10b–5."); *Dupuy v. Dupuy,* 551 F.2d 1005, 1014 (5th Cir.1977) ("The courts have established that with regard to private recovery for the violation of Rule 10b–5, a properly stated cause of action must establish the scienter of the defendant, the materiality of any misrepresentation or omission by the defendant, the extent of actual reliance by the plaintiff on the defendant's statements, and the justifiability of the reliance, frequently translated into a requirement of due diligence by the plaintiff.").

14. *Isquith v. Middle South Utilities Inc.,* 847 F.2d 186, 207 (5th Cir.1988) ("[W]hether the information disclosed would have been misleading, on those points about which the information's adequacy is questioned, to a reasonable potential investor who read the information as a whole.").

15. The *Isquith* panel stated:

As we see it, a court concludes that a disclosure is adequate as a matter of law by engaging in a three-part analysis. First, the court determines, based upon the facts of a particular case, *the scope of a particular defendant's disclosure-duty under the securities laws.* The court make this determination by responding to four questions, the answers to which depend on the particular facts before the court: *what information had to be disclosed,* where did the information have to be disclosed, when did the information have to be disclosed, and how did the information have to be disclosed? During the second part of the analysis, the focus shifts from the disclosure which should have been made to the disclosure which which was made, and the court's questions reflect the change: what information did the defendant disclose, where was the information disclosed, when was the information disclosed, and how was the information disclosed? And, as the last step, the court compares the disclosure the defendant should have made against the disclosure it did make to see if the defendant's disclosure was 'as a matter of law' adequate under the securities statutes.

in *S.E.C. v. Capital Gains Research Bureau*.[16] In *Capital Gains*, the Court quoted from an SEC report that culminated in the Investment Advisers Act of 1940. The report stated that:

[I]nvestment advisers could not 'completely perform their basic function—furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments—*unless all conflicts of interest between the investment counsel and the client were removed....*' One activity specifically mentioned and condemned by investment advisers who testified before the Commission was 'trading by investment advisers for their own account in securities in which their clients were interested....' The high standards of business morality exacted by our laws regulating the securities industry do not permit an investment adviser to trade on the market effect of his own recommendations without fully and fairly revealing his personal interests in these recommendations

to his clients.... *The Investment Advisers Act of 1940 thus reflects a congressional recognition 'of the delicate fiduciary nature of an investment advisory relationship' as well as a congressional intent to eliminate, or at least expose, all conflicts of interest which might incline an investment adviser—consciously or unconsciously—to render advice which was not disinterested.*[17]

Other circuits understand the investment adviser's fiduciary status to require disclosure of any conflicts of interest for the purpose of assessing liability under rule 10(b)–5. *S.E.C. v. Blavin*[18] and *Zweig v. Hearst Corp.*[19] In *Blavin*, the SEC moved for summary judgment arguing that, Blavin, an unregistered investment adviser, violated the fraud provisions of rule 10(b)–5 and the fraud and registration provisions of the Investment Advisers Act.[20] The court granted the motion and Blavin appealed.

Blavin owned Providence Investment Advisory, an unincorporated investment advis-

*Id.* at 208 (emphasis added).

**16.** 375 U.S. 180, 187, 201, 84 S.Ct. 275, 280, 287, 11 L.Ed.2d 237 (1963) (The court stated that the investment adviser relationship was of a "delicate fiduciary nature...."); *Lowe v. S.E.C.*, 472 U.S. 181, 195, 105 S.Ct. 2557, 2565, 86 L.Ed.2d 130 (1985) (In *Lowe*, the Court reviewed the history behind the Investment Advisers Act of 1940. The Court quoted from the testimony of a witness before a Senate Subcommittee. The witness testified that the investment advisers business "'... is a personal-service profession and depends for its success upon a close personal and confidential relationship between the investment-counsel firm and its client.... We must establish with each client a relationship of trust and confidence designed to last over a period of time...."); *Transamerica Mortgage Advisors Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) ("As we have previously recognized, section 206 [the anti-fraud provision of the Investment Advisers Act of 1940] establishes 'federal fiduciary standards' to govern the conduct of investment advisers....").

**17.** *Id.* at 189–201 (citing, in part, 2 Loss, Securities Regulation (2nd ed. 1961), 1412) (emphasis added).

**18.** 760 F.2d 706 (6th Cir.1985).

**19.** 594 F.2d 1261 (9th Cir.1979).

**20.** The anti-fraud provision of the Investment Advisers Act states:

[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of intrastate commerce, directly or indirectly—(1) to employ any device, scheme, or artifice to defraud any client or prospective client; (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client; (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibition of this paragraph shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction; (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.
15 U.S.C. section 80b–6.

ory service.[21]  He published newsletters under Providence's name without registering with the SEC as an investment adviser.[22]  The newsletters recommended the purchase of various stocks and made numerous misstatements about the financial condition of the reported companies.[23]  One newsletter stated that Providence could trade for its own account and that "the security portfolio of our employees, officers or affiliated companies may, in some instances, include securities mentioned in this issue."  The disclaimer did not reveal that Blavin was the sole owner of Providence.[24]  None of the newsletters stated that Blavin was trading in the recommended stocks.[25]

The appellate court affirmed.  Regarding the disclaimer as applied to the fraud claims under 10(b)–5 and the Investment Advisers Act, the *Blavin* panel stated:

[t]he district court found this disclaimer both "false and misleading," ... because it created the impression that Providence Investment Advisory was an investment company with numerous employees whose investments were not all known to management, when in fact Providence was a sole proprietorship of Blavin, who had invested in 25%, 10% and 10% of the publicly available stock of the companies he recommended.  In this factual context, a disclaimer that the investment advisor "may" trade in recommended securities for its own account is itself a material misstatement.  *The effect of such large holdings on Blavin's objectivity in making investment recommendations would be particularly important to his clients....*  As a fiduciary, the standard of care to which an investment adviser must adhere imposes "an affirmative duty of 'utmost good faith, and full and fair disclosure to all material facts,' as well as an affirmative obligation to 'employ reasonable care to avoid misleading' his clients." [26]

In *Zweig*, the plaintiffs, Zweig and Bruno, sued Campell, a financial columnist under rule 10(b)–5.[27]  They sued because Campell wrote, and the newspaper he worked for published, false information about the company ASI.[28]  Campell submitted an article for publication after purchasing 5000 shares of ASI stock at a discount.[29]  The plaintiffs argued that Campell's article inflated the stock's price and that he should have disclosed his purchase of the stock and the likelihood of the article's republication as an advertisement in an investment periodical that he partially owned.[30]  According to the plaintiffs, Campell should have disclosed this information so readers could judge for themselves whether Campell's personal motives for promoting ASI affected his objectivity.[31]  The district court granted Campell's motion for summary judgment.

■ A Ninth Circuit panel reversed.  Citing *Capital Gains*, the panel stated that:

[t]he holding in *Capital Gains* was limited to the duties imposed on investment advisers by the 1940 Act.  The plaintiffs here do not argue that Campell was an investment adviser as defined in that statute; thus, *Capital Gains* is not controlling.  But the failure to bring the case within the Investment Advisers Act does not mean that the claim under Section 10(b) and Rule 10b–5 should fail.  *We hold that as applied to the facts we must assume in this case, the Investment Advisers Act was not meant to limit the Securities Exchange Act or*

---

21.  *Blavin* at 708.

22.  *Id.*

23.  *Id.*

24.  *Id.*

25.  *Id.*

26.  *Id.* at 711–712 (citing *Capital Gains* 375 U.S. at 194, 84 S.Ct. at 284) (emphasis added).

27.  *Zweig* at 1263.

28.  *Id.*

29.  *Id.*

30.  *Id.*

31.  *Id.* at 1265–66.

*Rule 10b–5. Instead, we believe that these provisions complement each other and provide different means to curb slightly different types of "fraud or deceit."*.... *A number of cases since Capital Gains suggest that Rule 10b–5 requires the disclosure of conflicts of interests in situations similar to the facts of this case.*[32]

In *Capital Gains*, the Supreme Court recognized the fiduciary status of the investment adviser.[33] Following the spirit of this decision, *Blavin* and *Zweig* considered the investment adviser's fiduciary status in assessing liability under rule 10(b)–5. Based on these rulings, we hold that for the purpose of rule 10(b)–5, an investment adviser is a fiduciary and therefore has an affirmative duty of utmost good faith to avoid misleading clients. This duty includes disclosure of all material facts and all possible conflicts of interest.

In lieu of this standard, however, the plaintiffs suggest that a violation of the regulations applicable to subsection 3 of the anti-fraud provision of the Investment Advisers Act[34] satisfies the fraud element of a rule 10(b)–5 cause of action. These regulations require the delivery of standardized forms to investment advisory clients, requiring, along with other information, disclosure of profit on recommended investments.[35] We recognize that

**32.** *Id.* at 1267–68 (emphasis added).

**33.** *See supra* note 15.

**34.** *See supra* note 20.

**35.** Compliance with 15 U.S.C. section 80b–6(3) requires satisfying regulation 17 CFR 275.-206(3)–2 which states that:

(a) An investment adviser registered under section 203 of the Act [15 U.S.C. 80b–3], or a person registered as a broker-dealer under section 15 of the Securities Exchange Act of 1934 [15 U.S.C. 78*o*] and controlling, controlled by or under common control with an investment adviser registered under section 203 of the Act, shall be deemed in compliance with the provisions of section 206(3) of the Act [15 U.S.C. 80b–6(3)] in effecting an agency cross transaction for an advisory client, if: (1) The advisory client has executed a written consent prospectively authorizing the investment adviser, or any other person relying on this rule, to effect agency cross transactions for such advisory client, provided that such written consent is obtained after full written disclosure that with respect to agency cross transactions the investment adviser or such other person will act as broker for, receive commissions from, and have a potentially conflicting division of loyalties and responsibilities regarding both parties to such transactions; (2) The investment adviser, or any other person relying on this rule, sends to each client a written confirmation at or before the completion of each such transaction, which confirmation includes (i) a statement of the nature of such transaction, (ii) the date such transaction took place, (iii) an offer to furnish upon request, the time when such transaction took place, and (iv) the source and amount of any other remuneration received or to be received by the investment adviser and any other person relying on this rule in connection with the transaction, Provided, however, That if, in the case of a purchase, neither the investment adviser nor any other person relying on this rule was participating in a distribution, or in the case of a sale, neither the investment adviser nor any other person relying on this rule was participating in a tender offer, the written confirmation may state whether any other remuneration has been or will be received and that the source and amount of such other remuneration will be furnished upon written request of such customer; (3) The investment adviser, or any other person relying on this rule, sends to each such client, at least annually, and with or as part of any written statement or summary of such account from the investment adviser or such other person, a written disclosure statement identifying the total number of such transactions during the period since the date of the last such statement or summary, and the total amount of all commissions or other remuneration received or to be received by the investment adviser or any other person relying on this rule in connection with such transactions during such period; (4) Each written disclosure statement and confirmation required by this rule includes a conspicuous statement that the written consent referred to in paragraph (a)(1) of this section may be revoked at any time by written notice to the investment adviser, or to any other person relying on this rule, from the advisory client; and (5) No such transaction is effected in which the same investment adviser or an investment adviser and any person controlling, controlled by or under common control with such investment adviser recommended the transaction to both any seller and any purchaser. (b) For purposes of this rule the term "agency cross transaction for an advisory client" shall mean a transaction in which a person acts as an investment adviser in relation to a transaction in which such investment adviser, or any person controlling, controlled by, or under common control with

Rule 10(b)–5 and 15 U.S.C. section 80b–6(3) are both fraud-based causes of action. Consequently, particular types of fraud could violate the regulations applicable to section 80b–6(3) and thus section 80b–6(3) and the relevant element of rule 10(b)–5. However, non-compliance with the disclosure regulations of the Investment Advisers Act does not create per se liability under rule 10(b)–5. Instead, the kaleidoscope of possibilities for fraud created by the ingenuity of defendants counsels adoption of our open-ended holding.

"The design of the law is to protect the weak and the credulous from the wiles and stratagems of the artful and cunning, as well as those whose vigilance and security enable them to protect themselves," and "no rogue should enjoy his ill-gotten plunder for the simple reason that his victim is by chance a fool." [36]

And, although failure to satisfy applicable regulations could create liability under the Investment Advisers Act, a rule 10(b)–5 claim still requires proof of the requisite elements.[37] Our holding does not, therefore, create a private cause of action under the Investment Advisers Act. Instead, it only requires considering the fiduciary status of investment advisers in assessing liability under rule 10(b)–5.

In addition, our holding satisfies the Supreme Court's federalism concerns in the securities law forum. *See Santa Fe Industries Inc. v. Green.*[38] The *Santa Fe* Court stated that:

the cases do not support the proposition ... that a breach of fiduciary duty [under state law] by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule.... [W]e are reluctant to recognize a cause of action here to serve what is "at best a subsidiary purpose" of federal legislation.... It is difficult to imagine how a court could distinguish, for purposes of Rule 10b–5 fraud ... other types of fiduciary self-dealing involving transactions in securities. The result would be to bring within the Rule a wide variety of corporate conduct traditionally left to state regulation.... [T]his extension of the federal securities laws would overlap and quite possibly interfere with state corporate law.[39]

The *Santa Fe* Court's federalism concerns are three-fold: (a) advancing the purpose of rule 10(b)–5; (b) avoiding entanglement between federal legislation and state law; and (c) promoting a uniform federal standard. We address each in turn.

The purpose of rule 10(b)–5 is to eliminate fraud in securities sales.[40] Investors, however, place a high degree of confidence in the investment advisory relationship.

such investment adviser, acts as broker for both such advisory client and for another person on the other side of the transaction. (c) This rule shall not be construed as relieving in any way the investment adviser or another person relying on this rule from acting in the best interests of the advisory client, including fulfilling the duty with respect to the best price and execution for the particular transaction for the advisory client; nor shall it relieve such person or persons from any disclosure obligation which may be imposed by subparagraphs (1) or (2) of section 206 of this Act or by other applicable provisions of the federal securities laws.

**36.** *Myzel v. Fields,* 386 F.2d 718, 736 (8th Cir. 1967) (citing Prosser, Torts, section 103 (3rd ed. 1964).

**37.** A cause of action under rule 10(b)–5 requires proof of scienter. *See supra* note 13. In contrast, a cause of action under the anti-fraud section of the Investment Advisors Act may not. Although Fifth Circuit precedent requires a

showing of scienter under 15 U.S.C. section 80b–6(1), *Steadman v. S.E.C.,* 603 F.2d 1126, 1134 (5th Cir.1979), proof of scienter is not required to establish liability under 15 U.S.C. 80b–6(2). *S.E.C. v. Capital Gains Research Bureau Inc.,* 375 U.S. 180, 192, 84 S.Ct. 275, 283, 11 L.Ed.2d 237 (1963). Compliance with 15 U.S.C. section 80b–6(3), however, requires satisfaction of disclosure regulations. *See supra* notes 1 and 35. Furthermore, 10(b)–5 liability demands proof of a material misrepresentation or omission by the defendant; reliance by the defendant; and, due diligence by the plaintiff to pursue his or her own interest with care and good faith. *Stephenson v. Paine Webber Jackson & Curtis Inc.,* 839 F.2d 1095, 1098 (5th Cir.1988). *See supra* note 13.

**38.** 430 U.S. 462, 476, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977).

**39.** *Id.* 430 U.S. at 476–479, 97 S.Ct. at 1302–1303.

**40.** *See supra* note 9.

Possessing the status of investment adviser could, therefore, facilitate securities sales. The *Capital Gains* Court recognized this aspect of the relationship when it quoted from a Securities and Exchange Commission report stating that:

> investment advisers could not 'completely perform their basic function—*furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments*—unless all conflicts of interest between the investment counsel and the client were removed....'[41]

The purpose of rule 10(b)–5 would be hindered by allowing the investment adviser the advantage of fiduciary status to make sales and yet evaluating the investment adviser's conduct under a lesser standard for any fraud alleged in the sales transaction. Our holding recognizes this potential inequity by referencing the federal fiduciary standard[42] established for investment advisers in assessing liability under rule 10(b)–5.

Furthermore, concerning entanglement with state law, because our holding encompasses a developed federal standard[43] it does not require reference to state corporate and securities law or the state law of fiduciary relationships. The Supreme Court has recognized the investment advisers' fiduciary status.[44] Courts may refer to these cases instead of state analogies in deciding whether this status prohibits particular conduct. And, because state law is not considered, uniformity is promoted.

Our holding allows courts to illuminate the design of federal rule 10(b)–5 instead of accommodating the idiosyncrasies of state law.

## IV. DUE DILIGENCE

In their motion for summary judgment, Sorcic and Planning Ahead argued that the plaintiffs failed to exercise due diligence. Comments from the transcript of the motion for summary judgment suggest that the district court may have relied, in part, on due diligence in dismissing the plaintiffs' suit. Sorcic and Planning Ahead claimed that, inter alia, the plaintiffs did not request forms filed with the Securities and Exchange Commission under Investment Adviser Act regulations.[45] These forms, the argument continues, would have disclosed Sorcic's receipt of commissions on investments he recommended.

Under Fifth Circuit case law, "[i]n order to demonstrate a violation of rule 10(b)–5, the plaintiff must prove ... due diligence by the plaintiff to pursue his or her own interest with care and good faith." *Stephenson v. Paine Webber Jackson & Curtis*.[46] The standard for due diligence is "whether the plaintiff has 'intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow.'"[47] "[A] number of factors may be used to gauge whether a plaintiff's conduct indicates a lack of due diligence amounting to recklessness so as to bar recovery, including *'[the] existence*

---

**41.** *Capital Gains*, 375 U.S. at 189–201, 84 S.Ct. at 281–288 (emphasis added).

**42.** *Transamerica Mortgage Advisors Inc. v. Lewis*, 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979) ("As we have previously recognized, section 206 [the anti-fraud provision of the Investment Advisers Act of 1940] establishes 'federal fiduciary standards' to govern the conduct of investment advisers....").

**43.** *Id.*

**44.** *See Lowe v. S.E.C.*, 472 U.S. 181, 105 S.Ct. 2557, 86 L.Ed.2d 130 (1985); *Transamerica Mortgage Advisors Inc. v. Lewis*, 444 U.S. 11, 100

S.Ct. 242, 62 L.Ed.2d 146 (1979); *S.E.C. v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

**45.** *See supra* note 1.

**46.** 839 F.2d 1095, 1098 (5th Cir.1988); *Siebel v. Scott*, 725 F.2d 995, 1000 (5th Cir.1984) ("Due diligence is an element of a cause of action under section 10(b) and Rule 10b–5."); *Swenson v. Engelstad*, 626 F.2d 421, 424 (5th Cir.1980) ("A claim under section 10(b) requires ... diligence...."); *See supra* note 12.

**47.** *Stephenson supra* at 1098 (citing *Dupuy v. Dupuy*, 551 F.2d 1005, 1020 (5th Cir.1977)).

*of a fiduciary relationship....' "* [48]

■ Under this standard, questions of fact remain regarding the plaintiffs' due diligence. The district court did not admit evidence of Sorcic's alleged representations that he did not receive commissions on investments he recommended or consider Sorcic's fiduciary status as an investment adviser. On remand, the plaintiffs' due diligence must be judged against these and any other relevant factors.

## V. RICO

The plaintiffs alleged four predicate acts to support their RICO claim: (1) misrepresentation and/or failure to disclose under rule 10(b)–5; (2) churning; (3) mail fraud; and (4) wire fraud. Each is fraud-based.[49] The district court, however, dismissed the RICO claim as a matter of law because the court found no merit to the plaintiffs' rule 10(b)–5 claim. Finding Sorcic's disclosure adequate as a matter of law for the purpose of rule 10(b)–5, the district court then dismissed the entire RICO claim, in essence, holding that Sorcic did not commit any type of fraud. We disagree with this analysis.

■ Rule 10(b)–5 violations are predicate acts under RICO.[50] In this case, however, the district court erroneously held that the parol evidence rule barred evidence of the plaintiffs' rule 10(b)–5 claim. The rule 10(b)–5 aspect of the plaintiff's RICO claim must thus be reassessed. The district court must consider evidence of Sorcic's alleged misrepresentations, evidence of his disclosures and his status as a fiduciary and measure the adequacy of his disclosures against these and any other relevant factors.

■ Churning, a type of rule 10(b)–5 violation, is also a predicate act under RICO:

> Churning occurs when a securities broker enters into transactions and manages a client's account for the purpose of generating commissions and in disregard of the clients interests.... Once an investor proves that: (1) the trading in his account was excessive in light of his investment objectives; (2) the broker in question exercised control over the trading in the account; and (3) the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interests ... the broker may be held liable for a violation of the federal securities laws under section 10(b) of the Securities Exchange Act of 1934 ... and S.E.C. Rule 10b(5).[51]

The complaint states a churning claim. The plaintiffs' alleged that Sorcic designed transactions solely to generate excessive commissions for Sorcic and revenues for Integrated Resources while disregarding the plaintiffs' investment objectives. On remand, the district court must thus consider the evidence of churning in assessing the plaintiffs' RICO claim.

The plaintiffs' complaint also alleged violations of the mail and wire fraud statutes as predicate acts for their RICO claim.[52]

**48.** *Id.* at 1099 n. 12 (emphasis added) (citing *G.A. Thompson & Co. v. Partridge,* 636 F.2d 945, 955 (5th Cir.1981)).

**49.** *See supra* note 9 (Rule 10(b)–5 is fraud-based cause of action.); *Miley v. Oppenheimer & Co.,* 637 F.2d 318, 324 (5th Cir.1981) (One of the requirements of a churning claim is that "the broker acted with the intent to defraud or with willful and reckless disregard for the investor's interests...."); *Abell v. Potomac Insurance Co.,* 858 F.2d 1104, 1129 (5th Cir.1988) (Only fraudulent intent is necessary to establish mail or wire fraud not proof of the success of a fraudulent scheme.).

**50.** *Smith v. Ayres,* 845 F.2d 1360, 1366 n. 19 (5th Cir.1988); ("A Rule 10b–5 violation can constitute a predicate act under RICO...."); *Corwin v. Marney Orton Investments,* 788 F.2d 1063, 1069 (5th Cir.1986) ("The investors have alleged financial injuries as a result of various predicate acts, including violations of 10b–5 and federal mail fraud statutes. These allegations are sufficient to withstand a motion to dismiss."); *James v. Meinke,* 778 F.2d 200, 204 (5th Cir.1985) ("The rule 10b–5 securities violations submitted to the jury would therefore suffice as the predicate acts of racketeering activity for the RICO claims, if sufficiently established.").

**51.** *Miley,* at 324. *See also McNeal v. Paine, Webber, Jackson & Curtis Inc.,* 598 F.2d 888, 890 n. 1 (5th Cir.1979).

**52.** "As used in this chapter—(1) 'racketeering activity' means (B) any act which is indictable under any of the following provisions of title 18, United States Code: ... section 1341 (relating to

To establish either mail or wire fraud, the plaintiffs must only prove Sorcic and Planning Ahead's fraudulent intent; proof of a successful fraudulent scheme is not necessary.[53] The district court must consider Sorcic's fiduciary status, evidence of his alleged misrepresentations, and any other relevant facts in assessing the plaintiffs' mail and wire fraud claims under RICO.[54]

## VI. RECISSION OF THE CONTRACT UNDER THE INVESTMENT ADVISERS ACT

■ The plaintiffs claimed that Sorcic and Planning Ahead violated the anti-fraud provision of the Investment Advisers Act.[55] The claim was based on Sorcic's alleged misrepresentation that he did not earn commissions on the recommended investments and/or his failure to disclose that he did earn commissions on these investments. The district court did not appear to consider this argument. The plaintiffs, however, stated a valid claim.

The anti-fraud provisions of the Investment Advisers Act address conflicts of interests between investment advisers and their clients. *Capital Gains.*[56] In *Capital Gains*, a registered investment adviser failed to disclose to clients that he: (a) purchased securities for himself shortly before recommending the identical securities for long-term investment; and then, (b) immediately sold the securities for a profit derived from the price increase caused by his recommendation.[57] The Court held that the investment adviser violated section 80b–6(2) of the Investment Advisers Act which proscribes any practice operating "as a fraud or deceit upon any client or prospective client." [58]

In arriving at this holding, the court outlined the history of the Investment Advisers Act. The Court found this history, in large part, in a Securities and Exchange Commission report.[59] The portion of the report discussing investment advisers culminated in the Investment Advisers Act of 1940. The Court quoted from the report and stated that:

> [t]he report reflects the attitude—shared by investment advisers and the Commission—that investment advisers could not "completely perform their basic functions—furnishing to clients on a personal basis competent, unbiased, and continuous advice regarding the sound management of their investments—*unless all conflicts of interest between the invest-*

mail fraud), section 1343 (relating to wire fraud)." 18 U.S.C. 1961(1); *U.S. v. Marcello,* 876 F.2d 1147, 1153 (5th Cir.1989) ("Count 2 of the indictment charged Roemer with three predicate acts: state bribery, mail fraud, and wire fraud. With the McNally-commanded evaporation of the mail and wire fraud charges, there are no longer two predicate acts to support a RICO conviction."); *Youmans v. Simon,* 791 F.2d 341, 347 (5th Cir.1986). ("These RICO claims were based upon alleged predicate acts of securities laws violations, and mail and wire fraud. Predicate acts are those federal and state crimes that RICO defines in detail as 'racketeering activity.' 18 U.S.C. section 1961(1).").

53. *Abell* at 1129 ("Materiality and reliance, however are not elements of either wire fraud or mail fraud. Our cases unmistakably hold that plaintiffs need prove only a defendants' fraudulent intent; the success of a fraudulent scheme is not necessary to establish mail fraud or wire fraud."); *United States v. Bruno,* 809 F.2d 1097, 1104 (5th Cir.1987) ("Because the requisite elements of "scheme to defraud" under the wire fraud statute, 18 U.S.C. section 1343 and the mail fraud statute are identical, cases construing the mail fraud statute apply to the wire fraud statute as well."); *United States v. Westbo,*

746 F.2d 1022, 1025–26 (5th Cir.1984) ("The court [*United States v. Johnson,* 700 F.2d 699 (11th Cir.1983) ] held that when a defendant is proved to be a participant in a scheme to defraud and a document is mailed in furtherance of the scheme, the defendant may be convicted of mail fraud.... These mail fraud rules are equally applicable to wire fraud.").

54. We do not hold that fraud under rule 10(b)–5 is identical to the type of fraud actionable for churning or mail and wire fraud. We recognize, however, that particular types of fraud may, in some instances, support all of these claims.

55. *See supra* note 20.

56. 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

57. *Id.* at 187, 84 S.Ct. at 280.

58. *Id. See supra* note 20.

59. *Id.* (The Public Utility Holding Company Act of 1935 authorized the report.).

*ment counsel and the client were removed."* [60]

In arriving at its decision, the Court reasoned that:

an advisor who like respondents, secretly trades on the market effect of his own recommendation may be motivated—consciously or unconsciously—to recommend a given security not because of its potential for long-run price increase (which would profit the client), but because of its potential for short-run price increase to anticipated activity from the recommendation (which would profit the adviser). *An investor seeking the advice of a registered investment adviser must, if the legislative purpose is to be served, be permitted to evaluate overlapping motivations, through appropriate disclosure, in deciding whether an adviser is serving "two masters" or only one, "especially ... if one of the masters happens to be economic self-interest."* [61]

The analogy between *Capital Gains* and the present case demonstrates that the plaintiffs stated a valid claim under the Investment Advisers Act section 80b–6(2). The investment adviser in *Capital Gains* did not disclose a conflict of interest. The conflict was that the investment adviser was making profits on securities that he recommended to his clients. Analogously, in the present case, Sorcic also allegedly failed to disclose a conflict of interest. The conflict, according to the plaintiffs, is that Sorcic failed to disclose that he earned commissions from the investments that he recommended. In both *Capital Gains* and the present case, the investment adviser may have made recommendations that were not in the client's best interest. Therefore, like the client in *Capital Gains*, the plaintiffs must be "permitted to evaluate [the investment adviser's] overlapping motivations, through appropriate disclosure." [62] The district court must thus consider any evidence establishing Sorcic's liability under section 80b–6(2) of the Investment Advisers Act. Furthermore, claims under sections 80b–6(1) and (3) [63] must also be considered if the plaintiffs present the appropriate evidence.[64]

Sorcic and Planning Ahead argue, however, that the plaintiffs' claim is foreclosed because the plaintiffs sought recission of the securities transactions and not the investment advisers contract. Sorcic and Planning Ahead correctly state that under the Investment Advisers Act "[T]here exists a limited private remedy ... to void an investment advisers contract, but that the Act confers no other private causes of action, legal or equitable." [65] The plaintiffs' complaint states, in pertinent part, that:

[p]laintiff is entitled to a private right of action and the relief afforded pursuant to Section 80b–15 [66] of the Investment Ad-

60. *Id.* (emphasis added).

61. *Id.* at 185, 84 S.Ct. at 279 (emphasis added). The court stated that proof of scienter is not required to establish liability under 15 U.S.C. 80b–6(2). However, in actions brought under 15 U.S.C. 80b–6(1), the Fifth Circuit has held that a showing of scienter is necessary. *Steadman v. Securities and Exchange Commission,* 603 F.2d 1126, 1134 (5th Cir.1979). *See supra* note 36.

62. *Id.*

63. *See supra* note 19.

64. *See supra* note 36 (Particular types of fraud may be actionable under all three provisions of Section 80b–6.).

65. *Transamerica Mortgage Advisors Inc. v. Lewis,* 444 U.S. 11, 24, 100 S.Ct. 242, 249, 62 L.Ed.2d 146 (1979); *Corwin v. Marney Orton Investments,* 788 F.2d 1063, 1066 (5th Cir.1986) ("Sim-

ilarly, the Supreme Court has held that 'there exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but that the Act confers no other private causes of action legal or equitable.'"). Note that

[w]here recission is awarded, the rescinding party may have restitution of the consideration given under the contract, less any value conferred by the other party. See 5 A. Corbin, Contracts section 1114 (1964). Restitution would not, however, include compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction. Such relief could provide by indirection the equivalent of a private damages remedy that we have concluded Congress did not confer. *Transamerica* at 24 n. 14, 100 S.Ct. at 249 n. 14.

66. 15 U.S.C. section 80b–15 provides:

(a) Any condition, stipulation, or provision binding any person to waive compliance with

visers Act of 1940. Accordingly, plaintiff would show that every purchase of securities in violation of said Act was void and therefore plaintiff is entitled and hereby requests the court to recind each said contract of purchase and/or sale made in violation of said Act.

Based on this averment, we could conclude that the plaintiffs simply asked for more relief than is available instead of the incorrect relief. Section 80b–15 of the Investment Advisers Act states in pertinent part that:

> Every contract made in violation of any provision of this subchapter ... the performance of which involves the violation of ... any provision of this subchapter ... shall be void....[67]

As stated, the plaintiffs properly pled a claim under section 80b–6. The section 80b–6 claim constitutes a "violation of a provision" in the terms of section 80b–15 referenced in the first sentence of the quoted portion of the plaintiffs' averment. The plaintiffs thus sought available relief, avoidance of the contract under section 80b–15, even though the remainder of the plaintiffs' allegation requests relief unavailable to private plaintiffs under the Investment Advisers Act.

Moreover, assuming, without deciding, that the plaintiffs requested the wrong relief, under Federal Rules of Civil Procedure 8(a)(3) and 54(c), their claim remains viable. Federal Rule of Civil Procedure 8(a)(3) states in pertinent part that:

> [a] pleading which *sets forth a claim for relief,* whether an original claim, counterclaim, cross-claim, or third-party claim, shall contain ... (3) *a demand for judgment for the relief to which he deems himself entitled.*[68]

We have consistently interpreted this provision to allow a plaintiff any relief that the pleaded claim supports; requesting an improper remedy is not fatal.[69] Under this

---

any provision of this subchapter or with any rule, regulation, or order thereunder shall be void.

(b) Every contract made in violation of any provision of this subchapter and every contract heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of any provision of this subchapter, or any rule, regulation, or order thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, regulation, or order, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision.

**67.** *Id.*

**68.** Fed.R.Civ.P. 8(a)(3) (emphasis added).

**69.** *Industrial Development Board of the Town of Section, Alabama v. Fuqua Industries Inc.,* 523 F.2d 1226, 1235 (5th Cir.1975) ("Under the liberal pleading standard required by the federal rules, the complaint here would seem to encompass relief based on any suitable theory...."); *Kent v. Walter E. Heller & Co.,* 349 F.2d 480, 481 (5th Cir.1965) ("The fact that the appellant may have misconceived ... his remedy, would not have warranted dismissal of his complaint unless it appeared to a certainty that he was 'enti-

tled to no relief under any state of facts which could [have been proved] in support of the claim.'"); *Fowler v. Sponge Products Corp.,* 246 F.2d 223 (1st Cir.1957) ("It seems to us that the district court overlooked our liberal rule of federal practice under which the complaint is not to be dismissed because the plaintiff's lawyer has misconceived the proper legal theory of the claim, but is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, regardless of whether it asks for the proper relief."); *Hawkins v. Frick–Reid Supply Corp.,* 154 F.2d 88, 89 (5th Cir.1946) ("While the pleading appears to be somewhat confused, nevertheless, '"... every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings." Accordingly, a complaint is sufficient if it sets forth facts which show that the plaintiff is entitled to any relief which the court can grant.'...."). *See also* Wright and Miller, Federal Practice and Procedure, section 1255 at 251–52 (1969) (Cases construing rule 8(a) stand for the proposition that "[t]he sufficiency of a pleading is tested by the statement of the claim and the demand for judgment is not considered part of the claim. Thus the selection of an improper remedy in the demand will not be fatal to a party's pleading if the statement of his claim indicates he may be entitled to relief of some other type."). For an expression of the philosophy behind rule 8, *see Anderson v. Moorer,* 372 F.2d 747, 748 (5th Cir.1967) ("Exercising all of the charity and tolerance expected of us since the emancipation of modern pleading

interpretation, the plaintiffs' request for recission of each transaction in the present case, a remedy unavailable through the Investment Advisers Act, does not bar their claim. The plaintiffs properly pled a claim under sections 80b–15 and 80b–6 upon which other relief can be granted, namely, recission of the contract with Sorcic and Planning Ahead.

Federal rule of civil procedure 54(c) supports this analysis by illuminating the gloss placed on Rule 8(a)(3).[70] In pertinent part, Federal Rule of Civil Procedure 54(c) states that:

> [a] judgment by default shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Except as to a party against whom a judgment is entered by default, every final judgment *shall grant* the relief to which the party in whose favor it is rendered is entitled, *even if the party has not demanded such relief in his pleadings.*[71]

By its terms, Rule 54(c) mandates granting the relief that a claim merits. This mandate supports the conclusion reached under rule 8(a)(3) that a plaintiffs' failure to request appropriate relief does not prevent the award of available relief. Our holdings under rule 54(c) support this proposition.[72] In the present case, the plaintiffs' failure to request the proper remedy under the

Investment Advisers Act does not vitiate their claim. If they present sufficient evidence, the district court must award the proper remedy.

## VII. FEDERAL ANTI–INJUNCTION ACT

The district court granted Sorcic's and Planning Aheads' application for a preliminary injunction after granting their motion for summary judgment. The injunction: (1) prohibited the plaintiffs from prosecuting their state court action pending the result of this appeal; and (2) required them to dismiss the state proceedings if we affirmed the summary judgment.

The district court granted the injunction under the Federal Anti–Injunction Act.[73] The Act provides that:

> [a] court of the United States may not grant an injunction to stay proceedings in a State court except as expressly authorized by Act of Congress, or where necessary in aid of its jurisdiction, or to protect or effectuate its judgments.

The district court reasoned that the injunction was necessary "to protect or effectuate" the summary judgment because the summary judgment barred prosecution of the state court proceedings under res judicata.

---

from its ancient fetters, we have tried to discern what the plaintiff's complaint means.... Eschewing what strictures there are in Rule 8, F.R.Civ.P., we have indulged instead in that Rule's ambience of liberality, and, parsing the complaint's imprecise, vague, contradictory, argumentative, conclusory, and sometimes unintelligible prose, we glean the following.").

**70.** Wright and Miller, Federal Practice and Procedure, section 2662 at 130 (1983) ("The rule [54(c)] must be read in conjunction with Rule 8(a)(3), which requires that every pleading asserting a claim include a demand for the relief to which the pleader believes himself entitled.").

**71.** Fed.R.Civ.P. 54(c) (emphasis added).

**72.** *Thorington v. Cash,* 494 F.2d 582, 586 (5th Cir.1974) ("Thorington [the plaintiff] sought the contractual remedy of recission coupled with punitive damages as relief. That goes only to remedy, and dismissal because of the prayer for relief cuts off a plaintiff in a non-default situa-

tion from getting whatever relief the facts entitled him to. In the federal diversity forum, a request for a possibly inappropriate remedy in the pleadings, should not be held to vitiate a proper state law cause of action."); *Burton v. State Farm Mutual Automobile Insurance Co.,* 335 F.2d 317, 320 (5th Cir.1964) ("The District Judge apparently thought that the pleadings limited the scope of available relief, and if that formally sought was not allowable none could be granted. This is not the law. As we have many times said, except in the case of a default judgment, the Court is bound to grant whatever relief the facts show is necessary or appropriate."); *Smoot v. State Farm Mutual Automobile Insurance Co.,* 299 F.2d 525, 530 (5th Cir.1962) ("Finally, this ignores, as is so frequent the fact that where there is no default decree, the judgment to be awarded in the Assured's suit is not to be measured by the formal prayers for relief. The scope and nature of the relief depends on the facts established, F.R.Civ.P. 54(c).").

**73.** 28 U.S.C. section 2283.

We reversed the grounds upon which the district court based the summary judgment. Therefore, the summary judgment no longer has res judicata effect. *Woods Exploration & Producing Co. v. Aluminum Company of America.*[74] In *Woods*, we stated that:

> [under the Anti–Injunction Act] [i]t is clear that the power to issue an injunction restraining further proceedings in a state court rests on the existence of a final judgment which has a res judicata effect on the particular causes of action which are asserted in the state suit. It is also obvious that a judgment later reversed on appeal has no *res judicata* effect after the reversal.[75]

Under *Woods*, given our reversal of the district court, the injunction is dissolved. The plaintiffs may proceed with their state court action.

## VIII. COSTS

The district court correctly awarded costs. Its judgment is affirmed.

## IX. RULE 11

We considered appellee's Rule 11 argument and decided that it is without merit.

## X. INTEGRATED RESOURCES

The Integrated Resources defendants did not move for summary judgment. The plaintiffs dismissed the Integrated Resources defendants in a "Stipulated Order of Dismissal." They drafted the dismissal after the district court granted summary judgment to Sorcic and Planning Ahead.

In pertinent part, the dismissal states that:

> [if] the [p]laintiffs are successful in obtaining a reversal of the summary judgment previously granted in this cause to the [d]efendants Jack Sorcic and Planning Ahead, Inc., that the Defendants Integrated, Inc., Integrated Resources Equity Corporation, and Integrated Resources Marketing, Inc. can be reinstated as Defendants in such event.... [76]

We reversed the summary judgment. Accordingly, the plaintiffs may reinstate their claims against the Integrated Resources defendants.

## XI. CONCLUSION

In summary, we find that the district court incorrectly applied the parol evidence rule. We also hold that an investment adviser is a fiduciary for the purpose of assessing liability under rule 10(b)–5. In addition, the plaintiffs alleged valid claims under RICO and the Investment Advisers Act. The injunction is dissolved. Finally, the district court correctly awarded costs, the appellees did not establish a rule 11 claim, and the plaintiffs may reinstate their claims against the Integrated Resources defendants. REVERSED IN PART AND AFFIRMED AND REMANDED.

EDITH H. JONES, Circuit Judge, specially concurring:

The broad rule stated here by the majority, expounding a standard of duty applicable to an investment adviser under § 10(b) of the Securities Exchange Act of 1934 and Rule 10(b)–5, has not been urged upon us by appellants or briefed by either party.[1]

**74.** 438 F.2d 1286, 1316 (5th Cir.1971).

**75.** Citing 1B J. Moore, Federal Practice paragraph 0.416[2].

**76.** In full, the stipulation reads:
IT IS HEREBY STIPULATED AND AGREED, by and among the undersigned counsel for all parties, that the complaint herein is dismissed as against defendants Integrated Resources, Inc., Integrated Resources Equity Corporation and Integrated Resources Marketing, Inc., pursuant to rule 41(a)(1) of the Federal Rules of Civil Procedure.
IT IS ALSO STIPULATED AND AGREED that if the plaintiffs in this case are successful in obtaining a reversal of the summary judgment previously granted in this case to the Defendants Jack Sorcic and Planning Ahead, Inc., that the Defendants Integrated Resources, Inc., Integrated Resources Equity Corporation, and Integrated Resources Marketing, Inc., can be reinstated as Defendants in such event, and that the time period from the date of the original filing of this case, March 25, 1987, until such reinstatement shall not constitute time to be considered in the determination of any defense based on the applicable statute of limitations. Any such reinstatement shall be without waiver of any defense that said Defendants may have.

**1.** Appellants' brief dwelt on whether Sorcic's alleged failure to comply with various reporting

For that reason alone, I would not declare it. While I do not quarrel with the general propositions of § 10(b) liability stated by the majority, I fear they are untested against the much narrower facts of this case and may create the misimpression that this opinion is opening new vistas of Securities Act liability. I thus concur in the majority's result, but I respectfully disagree with their holding.

It is enough to reverse the district court's grant of summary judgment on appellants' § 10(b) claims by relying on *SEC v. Blavin,* 760 F.2d 706 (6th Cir.1985), whose facts resemble those produced here on summary judgment. *Blavin* holds that an investment adviser invites liability under § 10(b) and Rule 10(b)-5 by promoting a stock to his customers while dishonestly disclaiming any financial interest in the recommendation. On this basis, that the nondisclosure of a substantial financial conflict of interest by an investment adviser may be fraudulent under § 10(b) and Rule 10(b)-5, I concur with the majority's result.

The majority go on, however, to hold that because an investment adviser is a fiduciary [2], he therefore has an "affirmative duty of utmost good faith to avoid misleading clients. This duty includes disclosure of all material facts and all possible conflicts of interests." What, if anything, this language portends beyond the usual fact-specific predicates for § 10(b) liability, I am not sure. In particular, I do not know whether the majority would suggest that this fiduciary standard may reduce the threshold levels of scienter or materiality, or weaken the requirement that a fraudulent disclosure or omission be made in connection with the purchase or sale of securities or that reasonable reliance and due diligence are required of the investor. *Shivangi v. Dean Witter Reynolds, Inc.,* 825 F.2d 885, 888 fn. 6 (5th Cir.1987). Certain precedents already limit these possibilities, however. As the majority acknowledges,

requirements of the Investment Advisers Act is enough, without more, to state a § 10(b) action. The majority holds, and I agree, that it is not.

**2.** *See SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963).

"a cause of action under Rule 10(b)-5 requires proof of scienter." Footnote 37 in majority opinion. Our brothers in the Eleventh Circuit have recently held that breaches of fiduciary duty, based on state law, are not tantamount to establishing liability under § 10(b) and Rule 10(b)-5, in part because the federal statute, unlike state fiduciary duty law, requires proof of reasonable reliance and due diligence. *Gochnauer v. A.G. Edwards & Sons, Inc.,* 810 F.2d 1042, 1048 (11th Cir.1987). The Supreme Court has also clearly held that § 10(b) does not cover "a breach of fiduciary duty [by majority shareholders] *without any deception, misrepresentation or nondisclosure ...." Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 475, 97 S.Ct. 1292, 1302, 51 L.Ed.2d 480 (1977) (emphasis added).[3] Finally, if we set out to differentiate § 10(b) actions against investment advisers too prominently from ordinary actions under § 10(b) and Rule 10(b)-5, we risk the back-door creation of a private right of action for violating the Investment Advisers Act—a result forbidden by the Supreme Court in *Transamerica Mortgage Advisors, Inc. v. Lewis,* 444 U.S. 11, 17, 100 S.Ct. 242, 246, 62 L.Ed.2d 146 (1979). Because these limitations on § 10(b) liability may coexist uneasily with the majority's rule, I would have preferred to await a case whose facts and legal briefing more clearly mandated such a rule than does today's case.

### ON PETITIONS FOR REHEARING

It is ORDERED that appellants' alternative motion to vacate, amend or modify order on costs is GRANTED to the extent that the amounts reflected in the bill of costs, $577.20 are awarded to the appellants. The section of the opinion affirming the district court's determination of copying costs, however, remains unchanged.

It is FURTHER ORDERED that the petitions for rehearing filed in the above entitled and numbered cause are hereby DENIED.

**3.** Although the majority suggests that a concern for federalism motivated the court's holding in *Santa Fe,* that is only the second ground for the Supreme Court's opinion. The construction of § 10(b) itself is the first basis articulated by the Court.